UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
IMPULSE MARKETING GROUP, INC.,                  :
                                                :    05 CV 7776 (KMK) (JCF)
        Plaintiff,                              :
                                                :
    v.                                          :    **FIRST AMENDED**
                                                :    **COMPLAINT**
NATIONAL SMALL BUSINESS ALLIANCE, INC.          :
and DIRECT CONTACT MEDIA, INC.,                 :
                                                :    <u>JURY TRIAL DEMANDED</u>
        Defendants.                             :
                                                :
                                                :    ECF CASE
------------------------------------------------------------------X

　　　　1.　　Plaintiff Impulse Marketing Group, Inc., by its attorneys, Klein, Zelman, Rothermel & Dichter, L.L.P., as and for its First Amended Complaint hereby alleges, upon information and belief, as follows:

　　　　2.　　Plaintiff Impulse Marketing Group, Inc. ("IMG" or "Plaintiff"), is a corporation organized under the laws of the State of Nevada, with its principal place of business located at 5887 Glenridge Drive, Suite 400, Atlanta, Georgia 30328.

　　　　3.　　Defendant National Small Business Alliance, Inc. ("NSBA"), is a District of Columbia corporation with its principal place of business in Washington, D.C.

　　　　4.　　Defendant Direct Contact Media, Inc. ("DCM"), is a California corporation with its principal place of business in San Diego, California.

### BACKGROUND

　　　　5.　　IMG is an online marketing company that utilizes a network of affiliated entities to promote, market and sell various products and services, on behalf of third-party advertisers, through commercial e-mail and website-based advertisements.

{00074721;1}

Dockets.Justia.com

6. NSBA is a membership-based association of small businesses and individuals that pools its collective resources to obtain discounts and services ordinarily offered only to large corporations.

7. On or about April 26, 2005, IMG and NSBA entered into a written Advertiser Insertion Order (the "Insertion Order") and Advertiser Master Terms and Conditions Agreement (the "Terms and Conditions") (collectively, the "Agreement"), whereby IMG would provide certain online affiliate marketing services on behalf of NSBA for a fee.

8. On or about July 18, 2005, IMG and NSBA entered into an Addendum to the Agreement (the "Addendum").

9. Among other things, Section 10 of the Terms and Conditions and Section 2 of the Addendum each specifically provide that NSBA shall owe interest to IMG on any past due amounts at the rate of one and one-half percent (1½%) per month, plus any and all attorneys' fees and other costs and expenses incurred by IMG in the collection of past due amounts and interest from NSBA. Further, the Agreement provides for unilateral termination, but only upon thirty (30) days' written notice to the other party.

10. The Agreement further grants IMG the right to hold NSBA's agents jointly and severally liable for all amounts due under the Agreement. As set forth in detail below, DCM is, *inter alia*, the agent of NSBA.

11. Pursuant to the Agreement and the Addendum (collectively, the "Contract"), IMG provided online affiliate marketing services on behalf of NSBA. IMG placed advertisements associated with NSBA products and/or services throughout IMG's network of affiliated websites, within commercial e-mails transmitted to IMG's proprietary database of e-mail addresses, and to the databases of its affiliate marketing partners. Online users that responded to these

advertisements were directed to a website designated by IMG that contained registration applications for products and/or services.

12.     In accordance with the Contract, IMG was to be compensated each time an online user completed a registration application for a particular NSBA product and/or service on the website(s) designated by IMG (each such online user hereinafter referred to as a "Lead"). IMG was responsible for identifying and compiling a list of all Leads and sending such lists to NSBA and DCM.

13.     NSBA and DCM accepted the services provided by IMG.

14.     In addition, in accordance with the Contract, IMG was to be paid a fee for the sale of products and/or services to any and all online users that responded to IMG-placed advertisements but that did not properly complete the associated registration application on the website(s) designated by IMG (each such online user hereinafter referred to as a "Non Complete").

15.     Substantially all of the Non Completes relating to the Contract were transmitted to DCM at the explicit direction of DCM. This would allow DCM to then market each of these Non Completes directly.

16.     Pursuant to the terms of the Contract and in connection with the above-described affiliate marketing services, IMG submitted timely invoices on a daily basis to NSBA. These invoices reflected the amount of money owed to IMG for the services provided and the terms of payment. Substantially all invoices for Non Completes, and numerous invoices for leads, were sent to DCM, at DCM's direction, and paid for by DCM.

17. Relying on the expected compensation from NSBA and DCM, IMG paid hundreds of thousands of dollars in commissions to its affiliate marketers as compensation for the online users that were directed to the website(s) designated by IMG through such affiliates' marketing efforts.

18. DCM assumed NSBA's payment obligations under the Contract by, *inter alia*, compensating IMG with DCM checks from a DCM corporate bank account.

19. As of August 15, 2005, NSBA and DCM, on behalf of NSBA, paid IMG a total of $565,930.50 for services rendered. Thereafter, NSBA and DCM, on behalf of NSBA, failed and/or refused to pay for the outstanding amounts due under the various invoices rendered to NSBA by IMG.

20. On August 19, 2005, NSBA provided written notice that it was terminating the Contract effective immediately, without the thirty (30) days notice mentioned by the contract.

## SUBJECT MATTER JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(1) based upon the complete diversity of the parties.

22. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees.

23. Venue is proper in this district because the parties contractually agreed to venue of this matter in this Court.

## GENERAL JURISDICTION

24. On its website and elsewhere, DCM represents that it delivers marketing campaigns utilizing a multi-channel network of outsourced call centers, broadcast media, print and direct mail and has helped Fortune 100 companies create, develop, implement and manage

large scale direct marketing campaigns through its affiliate base of over 30,000 Internet marketers.

25. DCM transacts business in New York and contracts in New York and elsewhere to supply a large volume of goods or services in New York.

26. DCM purposefully availed itself of the privilege of conducting activities within New York, thus invoking the benefits and protection of New York laws.

27. DCM owns, runs and operates an active website located at www.dircm.com, where it transacts business over the Internet intentionally reaching beyond the State of California to systematically engage in business with New York-based businesses and New York residents / consumers.

28. DCM-related information is exchanged between the DCM website operator and New York-based businesses and/or New York-based residents / consumers.

29. DCM solicits business in New York by promoting its own marketing services to New York-based businesses.

30. DCM accepts client orders for its own marketing services from New York-based businesses.

31. DCM derives substantial revenue from New York residents / consumers that purchase its New York-based clients' products and/or services through marketing campaigns run by DCM on behalf of its New York-based clientele.

32. DCM admits that it delivers "business to business" and "business to consumer" marketing services for various New York-based businesses including, but not limited to, Chase Manhattan Bank, AT&T, MCI and IBM.

33.     DCM admits that it delivers "business to business" and "business to consumer" marketing services on behalf of the Republican and Democratic National Committees. Upon information and belief, DCM contracted with the Republican and Democratic National Committees to provide them with DCM marketing services. Such services, upon information and belief, are aimed at soliciting New York residential votes in New York City-wide, New York State-wide and national elections, all for substantial fees.

34.     DCM continuously contracts to supply DCM client-related goods or services to businesses and consumers located in the State of New York. For example, DCM develops and implements large-scale marketing campaigns for some of its New York-based clients through the DCM affiliate program, consisting of over 30,000 Internet marketers. Upon information and belief, several hundreds, if not several thousands, of the 30,000 DCM affiliate marketers are domiciled in the State of New York.

35.     DCM has consented to the jurisdiction of New York courts in other matters. For example, DCM has consented to jurisdiction in New York courts when it registered for the domain and URL located at www.dircm.com. Through registration and ownership of the domain and URL located at www.dircm.com, DCM expressly consented to the exclusive jurisdiction of the U.S. Courts, in New York City pursuant to the agreement between DCM and its domain name registrar.

## SPECIFIC JURISDICTION

36.     In connection with the transactions relating to the contractual relationship between DCM and IMG, DCM transacted business in New York.

37. Specifically, tens of thousands of individuals that reside in the State of New York visited the IMG-run website(s). By way of just a few examples, New York residents located in Seneca Falls, New York, Bronx, New York, Brooklyn, New York, Plainview, New York, Evan Mills, New York, and Freeport, New York visited the IMG-run website(s).

38. Of the tens of thousands of individuals that visited the IMG-run website(s), hundreds or thousands of individuals became Leads or Non Completes. The Non Completes representing residents from New York were sent to DCM, at the explicit direction of DCM. A limited sampling of these Non Completes demonstrates that the Non Completes consist of New York residents located in Seneca Falls, New York, Bronx, New York, Brooklyn, New York, Plainview, New York, Evan Mills, New York, and Freeport, New York.

39. Furthermore, DCM promoted and marketed products and/or services to individuals that reside in New York. By way of just a few examples, DCM promoted and marketed products and/or services to individuals that reside in, among other cities, Seneca Falls, New York, Bronx, New York, Brooklyn, New York, Plainview, New York, Evan Mills, New York, and Freeport, New York.

40. With respect to the specific terms and conditions of the contractual relationship between DCM and IMG, DCM compensated IMG for providing DCM with thousands of Non Completes generated from individuals that reside in New York. A limited sampling of these Non Completes demonstrate that such Non Completes represented individuals that reside in Seneca Falls, New York, Bronx, New York, Brooklyn, New York, Plainview, New York, Evan Mills, New York, and Freeport, New York.

41. At the explicit direction of DCM, IMG provided DCM with thousands of New York resident leads that were generated from IMG-run third party marketing campaigns so that DCM could promote products and/or services.

## DCM'S ASSUMPTION OF THE CONTRACT

42. DCM representatives, particularly Raymond Longino ("Longino"), the Chief Operating Officer of DCM and Michael Holleran ("Holleran"), owner, director, shareholder and/or principal of DCM, assumed the Contract by micro-managing each transaction underlying the Contract, transmitting and receiving scores of email relating to the Contract, explicitly directing each transaction underlying the Contract, explicitly admitting to the existence of a contractual relationship between IMG and DCM, approving the advertising creative to be used in connection with the Contract, reviewing and revising the IMG-run website terms and conditions, directing that DCM be provided with Non Completes, specifically instructing IMG, at all times, to send the lists of Leads and Non-Completes to a server owned and operated by DCM and by compensating IMG for both leads and Non Completes.

43. For example, IMG's main contacts throughout the course of performance of the Contract were Longino and Holleran. At various points, Longino and Holleran represented DCM to be the real party in interest with respect to the Contract.

44. By way of example, in an email sent in August 2005, Longino represented to IMG that DCM was "selling memberships in NSBA" and that IMG was "doing the job" it "**contracted** with DCM to do." (Emphasis added.)

45. Longino, Holleran and other DCM representatives assumed the obligations under the Contract by demanding that IMG send Non Completes and Leads directly to DCM.

46.     Longino, Holleran and other DCM representatives assumed the obligations under the Contract, by requiring IMG to generate sales from incentivised traffic. For example, in an email dated June 13, 2005, Longino advised IMG that he wanted to "make sure that some of the [NSBA] traffic is incentivised." Longino further represented to IMG that the incentives for NSBA-generated traffic "look good," that IMG should "continue to run" the incentivised offers for products and/or services and that IMG submit any and all new incentived offers for products and/or services, upon DCM's sole request, to DCM for its "review" prior to "implementation" of the incentivised offer.

47.     Longino, Holleran and other DCM representatives assumed the obligations under the Contract by demanding that IMG generate increased traffic for products and/or services. For example, in an email dated August 12, 2005, Longino demanded that IMG "push" to get as much traffic for products and/or services "out" quickly.

48.     Longino and DCM assumed the obligations of the Contract by admitting to a contractual relationship between IMG and DCM by representing to IMG, in an email dated August 12, 2005, that "We [DCM] are looking forward to a long and mutually successful partnership."

49.     Longino, Holleran and other DCM representatives assumed the obligations under the Contract by admitting to IMG that DCM would make payments on behalf of NSBA for services rendered pursuant to the Contract.

50.     Pursuant to the Contract, IMG was to be compensated in two (2) installments, per payment period, for Leads and Non Completes. During the term of the Contract, IMG was wired the first installment payment for IMG-generated Leads, sometimes by DCM and sometimes by NSBA. However, throughout the term of the Contract, DCM assumed NSBA's payment

obligations under the Contract by issuing DCM corporate checks to IMG for the IMG-generated Non Completes.

51. By way of example, on June 17, 2005, DCM issued a check to IMG in the amount of $21,690.00, representing $20,105.00 for a second installment payment due and owing to IMG (less $140.00 in wire fees), plus $1,725.00 for IMG-generated Non Completes in accordance with the explicit terms of the Contract.

52. On June 20, 2005, DCM issued a check to IMG in the amount of $2,655.00, representing payment due and owing to IMG for IMG-generated Non Completes in accordance with the transactions underlying the Contract.

53. On June 23, 2005, DCM issued a check to IMG in the amount of $19,788.00, representing $11,668.00 for a second installment payment due and owing to IMG (less $160.00 in wire fees), plus $8,280.00 for IMG-generated Non Completes in accordance with the transactions underlying the Contract.

54. DCM assumed the obligations under the Contract by demanding receipt of a "pipeline" report on behalf of NSBA from the applicable billing processor that was used to process payment by those individuals / consumers that purchased products and/or services at an IMG-related website via a credit card.

55. DCM is inexorably intertwined and/or closely related to NSBA.

56. DCM assumed the liabilities, benefits and day-to-day control of the Contract and manifested an intent to be bound by the terms of the Contract.

57. Further, DCM derived substantial pecuniary benefit from the transactions underlying the Contract and shared a close relationship / partnership with NSBA in fulfilling its contractual obligations.

58.  DCM was an intended beneficiary under the Contract.

59.  The relationship between DCM and NSBA is sufficiently close so that enforcement of the New York forum selection clause contained in the Contract against DCM is fair and foreseeable.

60.  DCM assumed the obligations and liabilities under the Contract and is therefore bound by the New York forum selection clause contained in the Contract because DCM derived substantial benefits from the Contract, explicitly admitted to the existence of a contractual relationship between it and IMG and was bound by the Contract.

61.  This Court has personal jurisdiction over DCM based upon the New York forum selection clause contained in the Contract.

## PIERCING THE CORPORATE VEIL

62.  The allegations contained in paragraphs 62 through 84 are pled as an alternative basis to confer jurisdiction upon DCM. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract.

63.  DCM and NSBA share common executive(s), officers and ownership. For example, NSBA's Chief Executive Officer, Dennis Mario, is also an executive of DCM.

64.  DCM's domination of NSBA was used to injure IMG because DCM and NSBA failed to sufficiently compensate IMG for payments due and owing IMG under the Contract, while diverting the proceeds of the transactions to DCM.

65.  DCM representatives, particularly Raymond Longino ("Longino"), the Chief Operating Officer of DCM, and Michael Holleran ("Holleran"), owner, director, shareholder and/or principal of DCM, exercised complete domination over NSBA with respect to the transactions underlying the Contract by micro-managing each transaction underlying the

{00074721;1}                                        11

Contract, transmitting and receiving scores of email relating to the Contract, explicitly directing each transaction underlying the Contract, explicitly admitting to the existence of a contractual relationship between IMG and DCM, approving the advertising creative to be used in connection with the Contract, reviewing and revising the IMG-run website(s)' terms and conditions, directing that DCM be provided with Non Completes, specifically instructing IMG, at all times, to send the lists of Leads and Non-Completes to a server owned and operated by DCM and by compensating IMG for Non Completes, and at times for leads.

66. For example, IMG's main contacts throughout the course of performance of the Contract were Longino and Holleran. At various points, Longino and Holleran represented DCM to be the real party in interest with respect to the Contract.

67. Furthermore, Longino represented to IMG, in an email sent in August 2005, that DCM was "selling memberships in NSBA" and that IMG was "doing the job" it "contracted with DCM to do."

68. Longino, Holleran and other DCM representatives exercised complete domination over NSBA with respect to the transactions underlying the Contract by demanding that IMG send Non Completes and Leads directly to DCM.

69. Longino, Holleran and other DCM representatives exercised complete domination over NSBA with respect to the transactions underlying the Contract, by requiring IMG to generate sales from incentivised traffic. For example, Longino, in an email dated June 13, 2005, advised IMG that he wanted to "make sure that some of the [NSBA] traffic is incentivised." Longino further represented to IMG in this email that the incentives for NSBA-generated traffic "look good," that IMG should "continue to run" the incentivised offers for products and/or services and that IMG submit any and all new incentivized offers for products and/or services,

upon DCM's sole request, to DCM for its "review" prior to "implementation" of the incentivised offer.

70. Longino, Holleran and other DCM representatives exercised complete domination over NSBA with respect to the transactions underlying the Contract by demanding that IMG generate increased traffic for products and/or services. For example, in an email dated August 12, 2005, Longino demanded that IMG "push" to get as much traffic for its products and/or services "out" quickly.

71. Longino and DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by admitting, for a second time in writing, to the existence of a contractual relationship between IMG and DCM by representing to IMG that "We [DCM] are looking forward to a long and mutually successful partnership."

72. Longino, Holleran and other DCM representatives exercised complete domination over NSBA with respect to the transactions underlying the Contract by admitting to IMG that DCM would make payments on behalf of NSBA for services rendered pursuant to the Contract.

73. Throughout the term of the Contract, DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by issuing DCM corporate checks to IMG for IMG-generated Non Completes sent directly to DCM as well as for leads.

74. By way of example, on June 17, 2005, DCM issued a check to IMG in the amount of $21,690.00, representing $20,105.00 for a second installment payment due and owing to IMG (less $140.00 in wire fees), plus $1,725.00 for IMG-generated Non Completes in accordance with the transactions underlying the Contract.

75. On June 20, 2005, DCM issued a check to IMG in the amount of $2,655.00, representing payment due and owing to IMG for IMG-generated Non Completes in accordance with the transactions underlying the Contract.

76. On June 23, 2005, DCM issued a check to IMG in the amount of $19,788.00, representing $11,668.00 for a second installment payment due and owing to IMG (less $160.00 in wire fees) plus $8,280.00 for IMG-generated Non Completes in accordance with the transactions underlying the Contract.

77. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by demanding receipt of a "pipeline" report on behalf of NSBA from the applicable billing processor that was used to process payment by those individuals / consumers that purchased products and/or services at an IMG-related website via a credit card.

78. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by being inexorably intertwined and/or closely related to NSBA.

79. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by manifesting an intent to be bound by the terms of the Contract by explicitly admitting, on at least two (2) occasions, in writing, to be a party to the Contract.

80. Further, DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by deriving substantial pecuniary benefit from the transactions underlying the Contract and sharing a close relationship / partnership with NSBA in fulfilling any and all contractual obligations.

81. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract by being an intended beneficiary under the Contract.

82. DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract; and since the relationship between DCM and NSBA is sufficiently close, enforcement of the New York forum selection clause contained in the Contract is fair and foreseeable.

83. DCM is therefore bound by the New York forum selection clause contained in the Contract because DCM exercised complete domination over NSBA with respect to the transactions underlying the Contract, derived substantial benefits from the Contract, explicitly admitted the existence of a contractual relationship between it and IMG and was bound by the Contract.

84. This Court has personal jurisdiction over DCM based upon the New York forum selection clause contained in the Contract.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST NSBA)

85. IMG incorporates by reference paragraphs 1 through 84 above, inclusive, as though fully set forth herein.

86. IMG has fully performed all of its obligations under the Contract.

87. NSBA has breached the Contract by failing to pay for services when payment came due. IMG has demanded payment for the services it provided pursuant to the Contract, but NSBA has failed and refused to make full payment.

88. NSBA further breached the Contract by terminating the Contract upon less than thirty (30) days' written notice.

89. Pursuant to the Contract, after credit for all payments received, NSBA is presently obligated to pay IMG $680,000.00, plus interest in the amount of one and one-half percent (1½%) per month from the date such amounts were due until they are paid in full. IMG is further entitled to its lost profits plus all costs, expenses and attorneys' fees incurred by IMG, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST DCM)

90. IMG incorporates by reference paragraphs 1 through 89 above, inclusive, as though fully set forth herein.

91. DCM assumed and admitted the contractual obligations under the Contract as a true party in interest.

92. DCM has repeatedly confirmed its liability for the Contract.

93. IMG has fully performed all of its obligations under the Contract.

94. DCM has breached the Contract by failing to pay for the amounts due and owing IMG. IMG has demanded payment for the services it provided pursuant to the Contract, but DCM has failed and refused to make full payment.

95. Pursuant to the Contract, after credit for all payments received, DCM is presently obligated to pay IMG $680,000.00, plus interest in the amount of one and one-half percent (1½%) per month from the date such amounts were due until they are paid in full. IMG is further entitled to its lost profits plus all costs, expenses and attorneys' fees incurred by IMG, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (BREACH OF IMPLIED CONTRACT AGAINST DCM)

96.   IMG incorporates by reference paragraphs 1 through 95 above, inclusive, as though fully set forth herein.

97.   By its words and actions, DCM impliedly agreed to pay IMG for the services provided to NSBA in exchange for the Leads and Non-Completes that it received from IMG.

98.   IMG has fully performed all of its obligations under the Contract.

99.   DCM has breached its implied contractual relationship with IMG by failing to pay for services when payment came due. IMG has demanded payment for the services it provided pursuant to the Contract, but DCM has failed and refused to make full payment.

100.   Pursuant to the Contract, after credit for all payments received, DCM is presently obligated to pay IMG $680,000.00, plus interest in the amount of one and one-half percent (1½%) per month from the date such amounts were due until they are paid in full. IMG is further entitled to its lost profits plus all costs, expenses and attorneys' fees incurred by IMG, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (PROMISSORY ESTOPPEL AGAINST DEFENDANTS)

101.   IMG incorporates by reference paragraphs 1 through 100 above, inclusive, as though fully set forth herein.

102.   IMG relied to its detriment on Defendants' obligations, representations and commitments to pay for the online affiliate marketing services provided by IMG.

103. Had IMG known that Defendants would not fully compensate it, IMG would not have expended time, effort and money marketing the products and/or services. Furthermore, IMG would not have compensated its affiliates for the marketing services performed by them in connection with the Contract.

104. Under these circumstances, it would be fundamentally unfair to permit Defendants to deny the existence of a contract, and they should be estopped from doing so.

105. IMG has fully performed all of its obligations under the Contract, and Defendants have derived the benefits of the Contract.

106. IMG has demanded payment for the services it provided pursuant to the Contract, but Defendants have failed and refused to make full payment.

107. Pursuant to the Contract, after credit for all payments received, Defendants are presently obligated to pay IMG $680,000.00, plus interest in the amount of one and one-half percent (1½%) per month from the date such amounts were due until they are paid in full. IMG is further entitled to its lost profits plus all costs, expenses and attorneys' fees incurred by IMG, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (QUANTUM MERUIT AGAINST DEFENDANTS)

108. IMG incorporates by reference paragraphs 1 through 107 above, inclusive, as though fully set forth herein.

109. At the express request of Defendants, IMG rendered online affiliate marketing services to Defendants with a reasonable expectation of being compensated.

110. The fair and reasonable value of the online affiliate marketing services rendered to Defendants, less credit for amounts paid, is $680,000.00, plus interest.

111. These online affiliate marketing services were rendered for the benefit of Defendants.

112. The amounts due have been duly demanded and have not been paid.

113. Defendants have been unjustly enriched in the sum of $680,000.00, plus lost profits interest.

114. Pursuant to the Contract, after credit for all payments received, DCM is presently obligated to pay IMG $680,000.00, plus lost profits, plus interest in the amount of one and one-half percent (1½%) per month from the date such amounts were due until they are paid in full, plus all costs, expenses and attorneys' fees incurred by IMG in connection with this action.

### SIXTH CAUSE OF ACTION
### (UNJUST ENRICHMENT AGAINST DEFENDANTS)

115. IMG incorporates by reference paragraphs 1 through 114 above, inclusive, as though fully set forth herein.

116. IMG has enriched, or conferred a benefit upon, both of the Defendants by providing the services as described herein.

117. The reasonable and fair value of the services provided as described herein, less credit for amounts paid, is in excess of $680,000.00, plus interest.

118. By refusing to pay for the services provided and accepted, Defendants have been unjustly enriched in the sum in excess of $680,000.00, plus interest.

## SEVENTH CAUSE OF ACTION
### (ATTORNEYS' FEES, COSTS AND EXPENSES)

119.   IMG incorporates by reference paragraphs 1 through 118 above, inclusive, as though fully set forth herein.

120.   Pursuant to the express terms of the Contract, IMG is entitled to an award of attorneys' fees, costs and expenses incurred in the collection of past due amounts and interest from NSBA, in an amount to be determined at trial.

WHEREFORE, IMG respectfully demands judgment against Defendants as follows:

(a)   An award of monetary damages in the amount of $680,000.00, together with interest at the rate of one and one-half percent (1½%) per month, plus lost profits;

(b)   The imposition of a constructive trust;

(c)   An award of IMG's attorneys' fees, costs and expenses incurred in the collection of past due amounts and interest from NSBA;

(d)   Trial by jury on all issues for which a trial by jury is available; and

(e)   Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December 2, 2005

KLEIN, ZELMAN, ROTHERMEL & DICHTER, L.L.P.

By: _____
Sean A. Moynihan (SM-5129)
Peter J. Glantz (PG-1063)
485 Madison Avenue
New York, New York 10022
(212) 935-6020
Attorneys for Plaintiff
Impulse Marketing Group, Inc.