UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

IMPULSE MARKETING GROUP, INC.,

           Plaintiff,

    v.

NATIONAL SMALL BUSINESS ALLIANCE, INC.
and DIRECT CONTACT MEDIA, INC.,

           Defendants.

---------------------------------------------------------------- X

      :    05 CV 7776 (KMK) (JCF)
      :
      :
      :
      :
      :
      :
      :    ECF CASE
      :
      :

**DECLARATION OF JEFFREY GOLDSTEIN IN OPPOSITION TO
DEFENDANT DIRECT CONTACT MEDIA INC.'S ("DCM") MOTION TO DISMISS
IMPULSE MARKETING GROUP, INC.'S AMENDED COMPLAINT AS AGAINST
DCM**

Jeffrey Goldstein, being duly sworn, deposes and says, upon information and belief:

1.      My name is Jeffrey Goldstein and I am President of Impulse Marketing Group,

Inc. ("Impulse").

2.      I submit this declaration in opposition to defendant DCM's motion to dismiss

Impulse's Amended Complaint as against DCM.

<u>Background</u>

3.      Impulse is an on-line marketing company that utilizes a network of affiliated

entities to promote, market and sell various products and services, on behalf of third-party

advertisers, through commercial e-mail and website-based advertisements.

4.      On or about April 26, 2005, Raymond Longino ("Longino"), the Chief Operating

Officer of DCM, and Michael Holleran ("Holleran"), owner, director, shareholder and/or

{00075849;1}

principal of DCM, and I memorialized a verbal agreement whereby Impulse would provide certain on-line affiliate marketing services on behalf of National Small Business Alliance ("NSBA") for a fee. (the "Agreement")  (See Exhibit "A" annexed hereto for a copy of the Master Advertiser Master Terms and Conditions, dated April 26, 2005.)

5.      At the time of the formation of the Agreement, Longino orally represented to me that DCM was the real party in interest to the Agreement despite the fact that National Small Business Alliance ("NSBA") was the signatory to the Agreement.

6.      This oral representation was confirmed to Impulse in an e-mail dated April 28, 2005, just two (2) days after the Agreement was executed.  Specifically, Longino, on DCM's behalf, represented to Impulse, that "We [DCM] are looking forward to a long and mutually successful partnership." (See Exhibit "B" annexed hereto for a copy of this April 28, 2005 e-mail.)

7.      On June 3, 2005, just one (1) month prior to the execution of the July 18, 2005 addendum to the Agreement, Longino admitted to Impulse for a second time, that DCM was "selling memberships in NSBA" and that Impulse was "doing the job" it "contracted with DCM to do." (See Exhibit "C" annexed hereto for a copy of this June 3, 2005 e-mail.)

8.      Because both Longino and Holleran represented to Impulse that DCM and NSBA were one and the same, I was comfortable enough with the business relationship with Longino and Holleran to enter into an addendum to the Agreement on or about July 18, 2005 (the "Addendum") (the Agreement and the Addendum are collectively referred to as the "Contract."). Over the course of the Contract negotiations, and throughout the course of the Contract, Longino and Holleran represented themselves to Impulse as both NSBA and DCM.

9.     Pursuant to the Contract, Impulse placed advertisements associated with NSBA products and/or services throughout Impulse's network of affiliated websites, within commercial e-mails transmitted to Impulse's proprietary database of e-mail addresses and to the databases of its affiliate marketing partners. On-line users that responded to these advertisements were directed to a website designated by Impulse that contained registration applications for products and/or services.

10.     Impulse relied to its detriment on DCM's obligations, representations and commitments to pay for the on-line affiliate marketing services provided by Impulse to DCM. Impulse pre-paid its affiliate marketing partners approximately one million dollars ($1,000,000.00) of which Six Hundred Eighty Thousand Dollars ($680,000.00) of Impulse's fixed cost has never been repaid.

11.     In accordance with the Contract, Impulse was to be compensated each time an on-line user completed a registration application for a particular NSBA product and/or service on the website(s) designated by Impulse (each such on-line user hereinafter referred to as a "Lead"). Impulse was responsible for identifying and compiling a list of all Leads and sending such lists to both NSBA and DCM. NSBA and DCM both accepted the benefits of the services provided by Impulse.

12.     Pursuant to the Contract, Impulse was also to be paid a fee for the sale of products and/or services to any and all on-line users that responded to Impulse-placed advertisements but did not properly complete the associated registration application on the website(s) designated by Impulse (each such on-line user hereinafter referred to as a "Non Complete").

13.     Notwithstanding the fact that DCM was not a signatory to the Contract, Longino and Holleran: (1) repeatedly admitted to Impulse in writing and further admitted orally, that it

was the real party in interest with respect to the Contract[1]; (2) micro-managed all aspects of the transactions underlying the Contract; (3) transmitted and received scores of e-mail relating to the Contract; (4) explicitly directed each transaction underlying the Contract; (5) approved the advertising content and creative material that was to be used in connection with the Contract: (6) reviewed and revised the Impulse-run website terms and conditions; (7) directed that DCM, rather than NSBA, be provided with Non Completes; (8) specifically instructed Impulse, at all times, to send the lists of Leads and Non-Completes to a server owned and operated by DCM; and (9) compensated Impulse, on DCM-issued corporate checks for both Leads and Non Completes in furtherance of the terms of the Contract.

<u>DCM Does Business In New York</u>

14.    It is my understanding that DCM now claims that it does not do any business in the State of New York. However, Longino and Holleran admitted to Impulse that DCM had helped market and promote the 2004 Republican National Convention held at Madison Square Garden in New York, New York.

15.    They both further admitted to Impulse that DCM represented many New York-based Fortune 100 companies and that it had an affiliate base of tens of thousands of Internet marketers. The DCM website confirms this representation by representing that DCM has an affiliate base of "Thirty Thousand (30,000)" Internet affiliate marketing partners.

16.    It is also my understanding that: (a) all of DCM's Internet marketing partners routinely promote products and/or services to New York residents/consumers; (b) thousands of DCM's Internet marketing partners are New York-based businesses; (c) DCM executes contracts with hundreds or thousands of its New York-based marketing affiliates to provide marketing

---

[1] The only course of dealing between the parties was pursuant to the explicit terms of the Contract between the parties.

services nationwide; (d) DCM contracted with Thirty Thousand affiliate marketing companies most of which market to New York residents and customers; (e) dozens of DCM's Fortune 100 clientele are New York-based companies with whom DCM has contractual relations. It is simply not credible for DCM to claim that it is not "doing business" in New York.

### DCM Transacted Business In New York With Respect To The Contract

17.      A review of Impulse's business records demonstrates that in connection with the transactions and services performed under the Contract, tens of thousands of individuals that reside in the State of New York visited the Impulse-run website(s) in response to DCM's promotion of NSBA's products and/or services. Of the tens of thousands of individuals that visited the Impulse-run website(s), hundreds or thousands of individuals in New York became DCM Leads or Non Completes.

18.      Impulse business records also demonstrate that DCM promoted and marketed products and/or services to individuals that reside in New York and compensated Impulse for providing DCM with thousands of Non Completes generated from individuals that reside in New York.

19.      At the explicit direction of DCM, Impulse further provided DCM with thousands of New York resident Leads that were generated from Impulse-run third-party marketing campaigns so that DCM could promote products and/or services.

### DCM Made Payments Under The Contract And Received Direct Benefit Under The Contract

20.      On several occasions, Longino and Holleran represented to Impulse both orally and in writing, that DCM would make payments on behalf of NSBA for services rendered and received pursuant to the Contract.

{00075849;1}                                          5

21.     DCM also demanded and received a "pipeline" report on behalf of NSBA from the applicable billing processor that was used to process payment by those individuals/consumers that purchased products and/or services at an Impulse-related website via a credit card.

22.     DCM made payments on behalf of NSBA for services rendered pursuant to the Contract.[2]

23.     With respect to the Non Completes, substantially all of the Non Completes relating to the Contract were transmitted to DCM at Longino's explicit direction thereby allowing DCM to then market each of these Non Completes directly.

---

[2] By way of example, on June 17, 2005, DCM issued a check to Impulse in the amount of $21,690.00, representing $20,105.00 for a second installment payment due and owing to Impulse (less $140.00 in wire fees), plus $1,725.00 for Impulse-generated Non Completes in accordance with the explicit terms of the Contract. On June 20, 2005, DCM issued a check to Impulse in the amount of $2,655.00, representing payment due and owing to Impulse for Impulse-generated Non Completes in accordance with the transactions underlying the Contract. On June 23, 2005, DCM issued a check to Impulse in the amount of $19,788.00, representing $11,668.00 for a second installment payment due and owing to Impulse (less $160.00 in wire fees), plus $8,280.00 for Impulse-generated Non Completes in accordance with the transactions underlying the Contract.

## Conclusion

24.    It is my understanding that DCM diverted proceeds due and owing to Impulse under the Contract from NSBA to DCM. As such, it would be extremely unfair for Impulse to proceed only against NSBA as DCM and NSBA, acting in concert and as a single entity, significantly injured Impulse.

25.    I certify and declare, under penalty of perjury, that the foregoing is true and correct to be best of my knowledge and belief.

Dated this 23rd day of January, 2006

_____
Jeffery Goldstein

Sworn and subscribed before me this
23rd day of January, 2006.

_____
Notary Public
EXP 2Sepro9

Exhibit A

## ADVERTISER
### MASTER TERMS AND CONDITIONS AGREEMENT

This Advertiser Master Terms and Conditions Agreement (the "Agreement") is made by and between Impulse Marketing Group, Inc., a _____ Corporation, with its principal place of business at _____ ("IMG") and National Small Business Alliance, a _____ Corporation, with its principal place of business at _____ ("Advertiser"). For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

**1. Incorporation.** Unless otherwise specifically stated in the applicable individual Advertiser Insertion Order Agreement ("Insertion Order(s)"), the terms and conditions of this Agreement shall be incorporated in and constitute a part of each Insertion Order entered into by and between IMG and the Advertiser, on and after the execution date hereof. If for whatever reason the terms of this Agreement and any Insertion Order(s) are in conflict, the terms contained in this Insertion Order(s) shall control. As used herein, "Advertiser" shall include the Advertiser(s) identified in the applicable Insertion Order(s). "Affiliate" shall mean any third party web site publisher with whom IMG contracts to include Advertising (as defined below) and/or promote Advertiser's offer on such web site.

**2. Agreement Term.** The initial term of this Agreement shall commence on the date of execution of this Agreement and shall terminate after a period of one (1) calendar year. This Agreement shall automatically renew for additional successive terms of one (1) calendar year, each on the same terms and conditions, unless either party gives written notice of its intent not to renew this Agreement at least thirty (30) days prior to the beginning of a new renewal period. "Term" as used herein shall mean the initial one (1) year period as well as any renewal periods.

**3. Insertion Order Term.** The term of each Insertion Order signed under the terms and conditions of this Agreement will be determined by the start and end date listed on each Insertion Order. Unless otherwise specified in the Insertion Order, each Insertion Order may be cancelled by IMG or the Advertiser upon thirty (30) days' prior written notice to the other party, provided, however, that Advertiser will remain liable for any and all charges then due and owing to IMG under the Insertion Order.

**4. Representations and Warranties.** Advertiser warrants and represents that: (a) Advertiser has the full right and authority to permit the use, reproduction, distribution and transmission of the Advertising (as defined below) by IMG and its Affiliates under this Agreement and all related Insertion Order(s); (b) the Advertising related to each Insertion Order is factually accurate and does not contain any fraudulent, misubstantiated or deceptive materials, or material which misrepresents, ridicules or attacks an individual or group on the basis of age, color, national origin, race, religion, sex, sexual orientation or handicap; (c) the Advertising does not promote or make claims that are not easily provable, nor does it falsify the product or message being communicated; and (d) the use, reproduction, distribution, or transmission of the Advertising will not, and the Advertising itself does not and will not, violate any foreign or domestic, federal, state, or local law or regulation, or any rights of any third party including, but not limited to, any copyright, patent, trademark, trade secret, music, image, or other proprietary or property right, or constitute false advertising, unfair competition, defamation, invasion of privacy or rights of celebrity, or violate any other right of any person or entity. Notwithstanding the foregoing, each of the parties agrees to remain solely responsible for and shall comply at all times with all laws relating or applying to its respective web site(s) including without limitation, all federal and state privacy laws governing the collection and use of data at the web site(s). Furthermore, IMG agrees that it will not knowingly place or allow its Affiliates to place the Advertising on any adult-oriented, pornographic or otherwise sexually-oriented web site or email communication. "Advertising" shall mean the advertising language, impressions, creative copy, graphics and depictions pertaining to Advertiser and provided by Advertiser to IMG hereunder to be published on IMG's or its Affiliates' web site(s).

The parties hereby represent and warrant that they shall at all times fully comply with all applicable state and federal statutes, rules and regulations with respect to their respective businesses including, without limitation, CAN-SPAM, laws governing deceptive trade practices and/or online marketing and/or advertising. IMG agrees to maintain a regularly updated suppression list containing current unsubscribe requests in conformance with CAN-SPAM. Advertiser agrees to: (i) check such suppression list on a daily basis; (ii) maintain similar suppression lists for opt-out requests that Advertiser receives directly from its e-mail recipients; (iii) process all unsubscribe requests, no matter the source, within five (5) days of its receipt of such requests and maintain electronic records evidencing the date and time of removal of such e-mail address(es) from its list and/or database; and (iv) either supply to IMG daily-updated suppression lists or provide access to a secure password-protected website where such information may be obtained. If Advertiser fails, at any time, to supply IMG with regular opt-out e-mail address updates, Advertiser agrees that IMG may conclude that no new unsubscribe or opt-out requests have been received by Advertiser. Advertiser represents and warrants that it will use any suppression list for the sole purpose of removing any e-mail addresses contained therein from the applicable Advertiser-owned and/or controlled mailing lists or to otherwise act to suppress from the receipt of future commercial e-mail messages such constituent e-mail addresses. A suppression list may be transmitted and/or disclosed to Advertiser in encrypted form, but such encryption shall not change or otherwise alter Advertiser's duty of confidentiality with respect to the constituent e-mail addresses. Advertiser explicitly agrees not to use any suppression list for purposes of e-mail marketing (or provide a suppression list, or any part thereof, to any third party for said purposes) and will not send, or cause to be sent, any commercial e-mail messages to an e-mail address appearing on any suppression list, unless Advertiser directly obtains from applicable e-mail addressee(s) subsequent Affirmative Consent, as defined in CAN-SPAM. Advertiser agrees not to use a suppression list for purposes of e-mail appending in any manner whatsoever. IMG further agrees to include a physical address for both

itself and Advertiser in the body of every e-mail. Advertiser must provide to IMG its physical mailing address. If Advertiser fails to provide such mailing address, IMG will use the physical mailing address appearing on the first page of this Agreement or in the applicable Insertion Order(s).

5. **Disclaimer of Warranties.** IMG shall provide all services performed hereunder on an "AS IS" basis and hereby expressly disclaims all warranties, expressed or implied, regarding IMG's services or any portion thereof, including any implied warranty of merchantability or fitness for a particular purpose and implied warranties arising from course of dealing or course of performance. Without limiting the generality of the foregoing, IMG specifically disclaims any warranty regarding: (1) the number of persons who will access the Advertising; and (2) any benefit Advertiser might obtain from the IMG services. IMG does not guarantee continuous or uninterrupted services. Unless otherwise provided in the Insertion Order(s), all numbers and amounts relating to acquisitions, sales or leads contained in the Insertion Order(s) are estimates only and are not at all guaranteed by IMG. Due to the nature of the advertising methods, over-delivery and under-delivery are typical. Although IMG makes every effort to uphold the highest standards of online marketing conduct, it will not be liable to Advertiser for any losses incurred by Advertiser through promotional activity engaged in by IMG on behalf of Advertiser pursuant to this Agreement or any Insertion Order(s).

6. **Licenses.** Advertiser hereby grants to IMG and its Affiliates the license and right to use, reproduce, publicly display, distribute and transmit the Advertising and represents and warrants that Advertiser has the full right and authority to grant such license. Advertiser represents and warrants that the Advertiser is the owner of or is licensed to use the entire contents and subject matter contained in the Advertising including, without limitation: (a) any and all constituent names and/or pictures of persons; (b) any and all constituent copyrighted material, trademarks, service marks, logos, and/or depictions of trademarked or service marked goods or services; and (c) any and all testimonials or endorsements contained in any Advertising submitted to IMG.

7. **Advertiser Indemnity.** Advertiser agrees to defend, indemnify and hold IMG and IMG's Affiliates, and their respective officers, directors, employees, agents, successors and assigns (collectively, "IMG Indemnitees") harmless, from and against any and all liability, loss, damage, claim and expense, including reasonable legal fees and expenses, that may be incurred by IMG Indemnitees and/or the Advertiser arising out of or relating to any breach of any provision or term hereof or of any Insertion Order. This ¶7 shall survive the termination or expiration of this Agreement.

8. **IMG Indemnity.** IMG agrees to defend, indemnify and hold Advertiser and its successors and assigns harmless, from and against any and all liability, loss, damage, claim and expense, including reasonable legal fees and expenses, that may be incurred by Advertiser and its successors and assigns arising out of or relating to any breach by IMG of any provision or term hereof or of any Insertion Order, and any claims of any persons whose email addresses are delivered by IMG to Advertiser if such persons did not opt in or otherwise consent to receive email or the Advertising from IMG. Furthermore, IMG agrees to be in compliance with the Can-Spam Act of 2003, subject to the terms of section 4 of this Agreement. This ¶8 shall survive the termination or expiration of this Agreement.

9. **Limitation of Liability.** IN NO EVENT SHALL IMG BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOST DATA, LOST SAVINGS OR LOST REIMBURSEMENTS), HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE AND STRICT LIABILITY), ARISING OUT OF THIS AGREEMENT OR ANY INSERTION ORDER(S), EVEN IF IMG WAS ADVISED OF THE POSSIBILITY OF THE OCCURRENCE OF SUCH DAMAGES. IN NO EVENT SHALL IMG BE LIABLE FOR DIRECT DAMAGES TO ADVERTISER OR ANY THIRD PARTIES ARISING OUT OF THIS AGREEMENT OR ANY INSERTION ORDER(S) FOR AN AMOUNT GREATER THAN THE AMOUNTS RECEIVED FROM ADVERTISER PURSUANT TO THIS AGREEMENT AND THE RELEVANT INSERTION ORDER(S).

10. **Terms of Payment.** Unless otherwise specified in an Insertion Order or agreed to in writing, IMG shall provide an invoice to Advertiser at the end of each month in which the advertising campaign described in the Insertion Order is run. Advertiser agrees to pay IMG within thirty (30) days from the date of the invoice. If payment is not made on time, IMG, at its sole option, may immediately terminate the Insertion Order and/or this Agreement. In addition, Advertiser shall be liable to IMG for: (a) interest on any past due amounts at the rate of one and one-half percent (1½%) per month; and (b) all attorney's fees and other costs and expenses incurred by IMG in the collection of past due amounts and interest from Advertiser. Advertiser agrees that it shall be solely liable for payment to IMG. Notwithstanding the foregoing, IMG shall have the right to hold the Advertiser and Advertiser's agents and affiliates jointly and severally liable for all amounts due. Further, Advertiser represents and warrants that it will furnish payment on all invoices, notwithstanding any non-payment to Advertiser by any third party including, without limitation, Advertiser's client(s).

For cost per acquisition, cost per lead, cost per click and any other cost per action campaign, unless otherwise stated in the Insertion Order, Advertiser guarantees that IMG will, at all times, receive the agreed rate. On cost per action campaigns, in instances where acquisition data cannot be supplied due to Advertiser's inability to provide such information, or in the event that the Advertiser encounters technical difficulties which cause Advertiser's web site to cease performance or to decrease, or in the event that IMG's tracking pixel stops reporting actions or reports less than the actual amount of actions, then Advertiser agrees to pay IMG a default payment in an amount to be unilaterally set by IMG based on the average number of acquisitions reported during previous months of the campaign.

11. **Creative.** Advertiser will be solely responsible for creating, managing, editing, reviewing, deleting and otherwise controlling the Advertising and the content thereof. Advertiser acknowledges that, in providing IMG and its Affiliates with the ability to publish and distribute the Advertising, IMG and its Affiliates are acting only as a passive conduit for the distribution and publishing of such Advertising. Advertiser retains complete discretion over the Advertising published and distributed by Advertiser. No changes shall be made to the Advertising by IMG or its Affiliates without the express, written consent of Advertiser. IMG has no obligation to Advertiser, and undertakes no responsibility, to review the Advertising to determine whether any such content may result in liability to third parties. Notwithstanding the foregoing, IMG shall have the right, in its sole discretion, to approve or reject any Advertising for any reason without liability to Advertiser or any of Advertiser's clients.

12. **Exclusivity; Non-Circumvention.** Other than as may be set forth in a particular Insertion Order, Advertiser agrees that this Agreement and related Insertion Order(s) constitute an exclusive agreement with IMG for the marketing of the Advertising that is the subject of the Insertion Order(s). Advertiser agrees that it will not knowingly utilize another online service and/or third party to advertise the Advertising, or any part thereof, that is the subject matter of the Insertion Order(s), other than IMG, for the term of the relevant Insertion Order(s) and for two (2) years thereafter. As a condition of this Agreement and as a further and independent material inducement to entering into this Agreement, Advertiser covenants and agrees that, throughout the term of the Agreement, IMG shall be afforded the right of first refusal, on an exclusive basis, with respect to any and all subsequent programs that Advertiser brings to market.

13. **Confidentiality.** Each of the Advertiser and IMG understands and agrees that all confidential and proprietary information provided by the other party under this Agreement including, but not limited to, the terms and conditions contained in this Agreement and each Insertion Order, shall be preserved and protected, and shall not be used, disclosed, shared or made available directly or indirectly to any third party without the written authorization of an executive officer of the other party for the Term of this Agreement and a period of one (1) year after expiration or termination of this Agreement. However, a receiving party shall have no obligation to protect any such information which (a) is already in the public domain or is later placed into the public domain through no fault of the receiving party; (b) is already known to the receiving party prior to disclosure by the disclosing party; (c) is provided to the receiving party by a third party without obligation of confidentiality; or (d) is independently developed by the receiving party without reference to any confidential or proprietary information of the disclosing party.

14. **Remedies.** Each party acknowledges that it would be extremely difficult to measure the damages that might result from any breach by either party of this Agreement or any Insertion Order(s), and that a breach may cause irreparable injury to both parties that could not be adequately compensated by monetary damages. Therefore, in addition to monetary damages, each party will be entitled to enforce this Agreement and/or any Insertion Order(s) by obtaining a court order prohibiting the other party from breaching this Agreement and/or such Insertion Order(s).

15. **Governing Law.** This Agreement shall be governed by, construed and interpreted according to the laws of the State of New York. The parties agree that the appropriate, convenient and exclusive venue for any action arising out of this Agreement shall be the court of appropriate jurisdiction in New York, New York. The parties hereby waive any right to a jury trial in such action.

16. **Waiver.** Failure of either party to insist upon strict compliance with the terms and conditions of this Agreement or the related Insertion Order(s) shall not be considered a waiver of such terms and conditions, which either party may enforce at any later date. This ¶16 Waiver shall not be waived, varied or modified in any way except by a writing signed by both parties to this Agreement. The invalidity or unenforceability of any provision of this Agreement or any Insertion Order(s) shall not affect the validity or unenforceability of any other provision thereunder.

17. **Force Majeure.** Neither party shall be liable for any delays or failures to perform (except for payment obligations) due to unforeseen circumstances beyond its control including, but not limited to, acts of God, war, riot, embargoes, acts of civil or military authorities, earthquakes, fire, floods, accidents, strikes, shortages of transportation, fuel, energy, labor or materials or failures of telecommunications or electrical power supplies, provided that the delayed party gives the other party prompt notice of the delay and its cause, and uses commercially reasonable efforts to promptly correct such delay or failure of performance.

18. **Assignment.** Advertiser may not assign any of its rights or obligations under this Agreement or any Insertion Order(s) without the prior written consent of IMG, and any attempt to do so shall be void. IMG may assign its rights and obligations under this Agreement or any Insertion Order(s) to a purchaser of all or substantially all of its assets or other successor to its business without the consent of or notice to Advertiser. Each of the covenants, terms, provisions, and agreements contained in this Agreement and any Insertion Order(s) shall be binding upon, and inure to the benefit of, the parties hereto and, to the extent permitted hereunder, their respective heirs, legal representatives, successors and assigns.

19. **Independent Contractor.** The parties to this Agreement are independent contractors, and no agency, partnership, joint venture or employer-employee relationship is intended or created hereby.

20. **Notice.** Any notice required to be given under the Agreement or any Insertion Order(s) shall be in writing and shall be deemed to have been delivered when (i) sent by telecopier and electronically confirmed, (ii) deposited in the U.S. mail (registered or certified mail), return receipt requested, with adequate postage affixed, or (iii) delivered to a national overnight courier service and sent to the addresses set forth on the first page of this Agreement or as otherwise specified in the relevant Insertion Order(s).

PAGE 06

04/27/2005 WED 9:25 FAX 2126839181                              ☒007/007
   04/26/05  17:08 FAX 4154888101      S F MARRIOT              ☒007
04/25/2005 MON 17:53  FAX 2126839181                            ☒007/007

21. Survival. All provisions of this Agreement and any Insertion Order(s), which by their nature are intended to survive expiration or termination, shall survive any expiration or termination of this Agreement or the related Insertion Order(s).

22. Entire Agreement. This Agreement and the related Insertion Orders constitute the entire agreement between the parties with respect to the subject matter hereof. No oral promises or representations in connection herewith shall be binding upon either party, nor shall this Agreement or any Insertion Order(s) be modified in any manner except by amendment in writing executed by the parties hereto. In the event of any proceeding or litigation arising out of or relating to this Agreement or any Insertion Order(s), the prevailing party shall be entitled to receive its reasonable attorneys' fees, costs and expenses from the non-prevailing party, including at trial, on appeal and in bankruptcy.

IN WITNESS WHEREOF, the parties herein execute this Agreement as the 26 day of APRIL, 2005.

Advertiser                              IMG

Signature: _____             Signature: _____

Print Name: DENNIS MARIO               Print Name: Jon Golbraon

Title: CEO / PRESIDENT                 Title: _____

Company: NATIVE SMALL
           BUSINESS ALLIANCE

## ADDENDUM TO IMPULSE MARKETING GROUP, INC. ADVERTISER INSERTION ORDER AND ADVERTISER MASTER TERMS AND CONDITIONS AGREEMENT, EACH ENTERED INTO ON OR ABOUT APRIL 26, 2005

Impulse Marketing Group, Inc. ("IMG") and National Small Business Alliance ("Advertiser") agree that the following Addendum shall supplement or, to the extent inconsistent, supersede the Impulse Marketing Group, Inc. Advertiser Insertion Order and Advertiser Master Terms and Conditions Agreement, each respectively entered into on or about April 26, 2005 (collectively, the "Agreement"):

**WHEREAS,** the Agreement sets forth the parties' respective rights and obligations with respect to an online customer cost-per-acquisition advertising campaign (the "Campaign") as contemplated under the Agreement;

**WHEREAS,** the purpose of this Addendum is to memorialize certain changes to the definition of a valid acquisition, to detail payment obligations for incentivized offers, to define payment terms for non-valid acquisitions or "Non Completes," to replace Section 10 "Terms of Payment," and to clarify the term of any and all applicable insertion orders entered into by the parties according to the terms and conditions as set forth hereinbelow; and

**NOW, THEREFORE,** in consideration of the premises set forth above and the mutual promises, agreements and conditions stated herein, the parties hereto agree as follows:

1.      Definition of a Valid Acquisition. Advertiser agrees that, for purposes of the Agreement, a "Valid Acquisition" shall be any online user that links to Advertiser's site from the IMG Network, fills out and completes an online application for one or more of Advertiser's offerings or programs and receives an automated third-party online application acceptance message from Star Check or such other vendor designated by Advertiser in its sole discretion (an "Acceptance Message"). Such online users shall be considered Valid Acquisitions for the purposes of the Agreement regardless of whether or not a bank or Advertiser approves the specific applications. IMG agrees to take reasonable steps to monitor for unauthorized advertising copy or excessive fraudulent applications submitted on the part of any affiliate of IMG. Such steps shall include, but not be limited to, providing an account number identifier for each applicable IMG affiliate from which any Valid Acquisition originates, such account number identifier to be included on the Daily Invoices (as that term is defined hereinbelow). IMG will terminate the applicable affiliate's right to market Advertiser offers and/or programs: (i) where IMG deems that the affiliate is using unauthorized advertising copy or submitting an excessive number of fraudulent applications based upon monitoring its account number identifier; or (ii) within forty-eight (48) hours upon receiving a written request from Advertiser to terminate the applicable affiliate's right to market Advertiser offers based on that affiliate's use of unauthorized advertising copy or submission of fraudulent applications. Where IMG determines, in its sole discretion, that an affiliate's use of unapproved advertising copy (which alters a material term of the offer) or submission of fraudulent applications is widespread, IMG shall withhold payment to that affiliate for certain Valid Acquisitions that IMG determines were generated during the prior forty-eight (48) hour period through that affiliate's unapproved usage of such advertising or submission of such fraudulent applications. Such determination by IMG shall not be unreasonably withheld. Only in such an event, Advertiser shall not be required to make payment to IMG for those specific Valid Acquisitions generated through unapproved advertising copy or fraudulent applications for which IMG withholds compensation to the applicable affiliate. Notwithstanding the foregoing, Advertiser agrees that IMG shall be paid in accordance with the Terms of Payment contained hereinbelow for any and all other Valid Acquisitions.

2.      Incentivized Offers. Advertiser understands and agrees that any and all users that apply for one of Advertiser's offers or programs through an IMG incentivized offer or one provided by an IMG affiliate (which shall include, but not be limited to, offers of compensation or other benefit to users that apply for one of Advertiser's offers or programs) and receive Acceptance Messages shall also be considered Valid Acquisitions. IMG agrees to provide Advertiser with the text, graphics and terms, though not the applicable publishing affiliate's identity, for all incentivized offers in advance of publication of such incentivized offers. Advertiser must approve in writing all such incentivized offers, such approval not to be unreasonably withheld, conditioned or delayed.

{00072045;1}

3.    Terms of Payment.    IMG shall provide an invoice to Advertiser at the end of each day in which the advertising campaign described in the Insertion Order is run (the "Daily Invoices"). All cost-per-acquisition and other payments will be based on the Daily Invoices. Payments made to IMG shall be accompanied by Advertiser's own records of the Valid Acquisitions for the given period ("Advertiser Reports"). In the event of any discrepancy between the Advertiser Reports and the Daily Invoices, the Daily Invoices shall govern for purposes of payments due and payable to IMG.

Advertiser agrees to pay IMG: (i) sixty-five dollars ($65) for any and all valid acquisitions as defined in the Agreement generated prior to May 16, 2005, such payments to be made in two installments: (a) thirty-two dollars and fifty cents ($32.50) to be paid within eleven (11) business days after the date that such valid acquisition is generated; and (b) thirty-two dollars and fifty cents ($32.50) to be paid within thirty-two (32) calendar days after the date that such Valid Acquisition is generated, such payments to be reconciled in accordance with the terms and conditions of the Agreement; (ii) fifty-five dollars ($55) per Valid Acquisition for any and all Valid Acquisitions generated on or after May 16, 2005, but prior to June 27, 2005, within eleven (11) business days after the date that such Valid Acquisition is generated; and (iii) sixty-five dollars ($65) per Valid Acquisition for any and all Valid Acquisitions generated on or after June 27, 2005, such payments to be made in two installments: (a) forty-five dollars ($45) to be paid within eleven (11) business days after the date that such Valid Acquisition is generated; and (b) twenty dollars ($20) to be paid within thirty-two (32) calendar days after the date such Valid Acquisition is generated.

In addition, Advertiser will pay IMG: (i) twelve dollars and fifty cents ($12.50) apiece for every subscription and/or sale of Advertiser's products and/or services to each and every "Non Complete" as defined under the Agreement (such subscriptions and/or sales to Non Completes hereinafter referred to as "Non Complete Sales") resulting from Non Complete information that was generated prior to July 1, 2005 (regardless of when the Non Complete information was given to NSBA); and (ii) fifteen dollars ($15) apiece for every subscription and/or sale of Advertiser's products and/or services to each and every Non Complete Sale resulting from Non Complete information that was generated on or after July 1, 2005 (regardless of when the Non Complete information was given to NSBA). Advertiser shall make such payments for Non Complete Sales: (i) within thirty-two (32) calendar days after the date that such Non Complete Sale is generated for any and all Non Complete Sales generated prior to July 1, 2005; and (ii) within eleven (11) business days after the date that such Non Complete Sale is generated for any and all Non Complete Sales generated on or after July 1, 2005. IMG shall send Advertiser, at the close of business of each business day, a list of the applicable Non Completes as they become known to IMG. Advertiser shall send IMG a report ("Non Complete Report"), at the close of business of each business day, detailing the number of Non Completes it received from IMG and the number of Non Complete Sales that were generated on that applicable day. The Non Complete Report shall include, but not be limited to, the following information: the name, phone number and sale date for each Non Complete Sale. For purposes of this Agreement, a Non Complete Sale shall be deemed to have occurred when a Non Complete fills out and completes an application for one or more of Advertiser's offerings or programs either online, offline or via telephone with Advertiser (or such third-party representative(s) as Advertiser designates to handle such telephone communications) and such application is accepted in real time using an online or offline validation method similar to Star Check. Such offline users shall be considered Non Complete Sales regardless of whether or not a bank, financial institution or Advertiser approves the specific applications and whether or not the Non Complete Sales were the result of fraud on the part of any Non Complete.

If the necessary payments contemplated hereunder and/or in the Agreement are not made on time, IMG, at its sole option, may immediately terminate the Agreement and/or this Addendum. In addition, Advertiser shall be liable to IMG for: (a) interest on any past due amounts at the rate of one and one-half percent (1½%) per month; and (b) all attorney's fees and other costs and expenses incurred by IMG in the collection of past due amounts and interest from Advertiser. Advertiser agrees that it shall be solely liable for payment to IMG. Notwithstanding the foregoing, IMG shall have the right to hold the Advertiser and Advertiser's agents and affiliates jointly and severally liable for all amounts due. Further, Advertiser represents and warrants that it will furnish payment on all invoices, notwithstanding any non-payment to Advertiser by any third party including, without limitation, Advertiser's customer(s) and client(s).

The parties hereby agree that effective August 11, 2005, IMG will cease sending Non Completes to Advertiser. At such time, Advertiser shall make an offer to compensate IMG for the total number of Non Completes that IMG sends Advertiser thereafter, regardless of whether or not any subsequent Non Complete Sales occur (the "Gross Non Completes"). IMG may, in its sole discretion, accept, reject or renegotiate the terms and conditions of the Gross Non Completes compensation offer tendered by Advertiser. Where IMG elects to outright reject the Non Complete compensation arrangement, those provisions in this Addendum and the Agreement relating to Non Complete delivery and compensation shall terminate and the remainder of this Addendum and the Agreement will continue in full force and effect. Notwithstanding the foregoing, Advertiser shall still make all payments to IMG, pursuant to the terms and conditions of the Agreement and this Addendum, for any and all Non Complete Sales resulting from Non Complete information that were generated on or before August 11, 2005 (regardless of when the Non Complete information was given to NSBA).

IMG agrees that it will send and deliver all Non Completes that have been generated since the execution of the Agreement, through the date set forth hereinbelow, to NSBA within forty-eight (48) hours of execution of this Addendum.

     4.    <u>Insertion Order Term.</u>    The term of each Insertion Order signed under the terms and conditions of this Agreement will be determined by the start and end date listed on each Insertion Order. Unless otherwise specified in the Insertion Order, each Insertion Order may be cancelled by IMG or the Advertiser upon seventy-two (72) hours prior written notice to the other party, provided, however, that Advertiser will remain liable for any and all charges then due and owing to IMG under the Insertion Order.

     **IN WITNESS WHEREOF**, the undersigned have caused this Addendum to the underlying Agreement to be duly executed by their respective authorized representatives as of the day and year set forth hereinbelow.

<u>**ACCEPTED AND AGREED TO:**</u>

IMPULSE MARKETING GROUP, INC.:     NATIONAL SMALL BUSINESS ALLIANCE:

By: _____     By: _____

Title:     Title:

Date:     Date:

{00072045;1}     3

Exhibit 3

## Jon Goldstein

**From:**    "Raymond Longino" <rlongino@dircm.com>
**To:**      <jon@impulsemg.com>
**Sent:**    Thursday, April 28, 2005 1:11 PM
**Subject:** Re: Impulse

Jon,
It was great to chat with you as well. As discussed please push to get as much traffic out today as possible.
Please feel free to call me at any time. We are looking forward to a long and mutually successful partnership.

Make It A Great Day!
Raymond C Longino
Direct 619-233-8707
Cell 619-787-7855


----- Original Message -----
From: Jon Goldstein
To: Raymond Longino
Sent: Thursday, April 28, 2005 11:00 AM
Subject: Impulse

Hey Ramond,

It was good speaking with you, We want to always be proactive on any issues that arise. Please keep me
in the loop on all news  Both good and bad

Thanks

Jon Goldstein
678.805.2114
CELL  706 207 4460
Here is our wiring instructions
Regions Bank
Douglasville Ga
ABA# 062005690
ACCT# 6469527656

Exhibit c

**Jon Goldstein**

| | |
|---|---|
| **From:** | "Raymond Longino" <rlongino@dircm.com> |
| **To:** | <jon@impulsemg.com>; "'Steve Decker'" <sdecker5@hotmail.com> |
| **Sent:** | Friday, June 03, 2005 10:31 AM |
| **Subject:** | RE: RE: New Skin On NSBA |

Jon,

Did you see the letter from our attorney? He wrote one to you and one to
Moneymaker. Please ignore Moneymaker. The letter from the attorneys
explains it all. We have not violated the agreement. Moneymaker has by
sending everybody a stored value card and by sending a credit app to the
bank on everybody instead of waiting to see who cleared. Our agreement with
him clearly says valid NSBA members only. The terms and conditions state
what a valid member is. We are selling memberships in NSBA not SVM
products. Those products are benefits of a membership. He got in trouble
with the bank because the turn down rate was so high. The bank complained
that he was sending them people with 350 credit scores. However, you are
doing the job you contracted with DCM to do. Moneymaker must take this
matter up with DCM. Keep rockin!!!

Raymond

-----Original Message-----
From: Jon Goldstein [mailto:jon@impulsemg.com]
Sent: Friday, June 03, 2005 8:19 AM
To: Steve Decker
Cc: rlongino@dircm.com
Subject: Re: RE: New Skin On NSBA

on with money maker he is bitching what do you want me to do
----- Original Message -----
From: "Steve Decker" <sdecker5@hotmail.com>
To: <jon@impulsemg.com>
Cc: <rlongino@dircm.com>
Sent: Friday, June 03, 2005 11:17 AM
Subject: FW: RE: New Skin On NSBA

> jon make these changes to the website as advised by our attorney and your
> good to go
>
> >From: "Adam Solomon" <Adam@lustigmanfirm.com>
> >To: <rlongino@dircm.com>
> >CC: "'Steve Decker (E-mail)'" <sdecker5@hotmail.com>
> >Subject: RE: New Skin On NSBA
> >Date: Thu, 2 Jun 2005 16:14:21 -0400
> >MIME-Version: 1.0
> >Received: from safety-mx2.atl.registeredsite.com ([64.224.219.100]) by

> >mc10-f9.hotmail.com with Microsoft SMTPSVC(6.0.3790.211); Thu, 2 Jun 2005
> >14:05:36 -0700
> >Received: from mail10.atl.registeredsite.com
(mail10.atl.registeredsite.com
> >[64.224.219.84])by safety-mx2.atl.registeredsite.com (8.12.11/8.12.11)
with
> >ESMTP id j52KsiRm017527for <sdecker5@hotmail.com>; Thu, 2 Jun 2005
20:54:44
> >GMT
> >Received: from imta01a2.registeredsite.com (imta01a2.registeredsite.com
> >[64.225.255.10])by mail10.atl.registeredsite.com (8.12.11/8.12.8) with
> >ESMTP id j52KshYj001201;Thu, 2 Jun 2005 20:54:43 GMT
> >Received: from Adam1 ([68.161.239.59]) by imta01a2.registeredsite.com
> >    with ESMTP      id
> ><20050602205423.EWZT14901.imta01a2.registeredsite.com@Adam1>;
Thu,
> >2 Jun 2005 16:54:23 -0400
> >X-Message-Info: JGTYoYF78jEmCvpTqXS8mPbZziQkyJ1m2MVDL0AnIPE=
> >X-MSMail-Priority: Normal
> >X-Mailer: Microsoft Outlook, Build 10.0.4024
> >X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
> >Return-Path: Adam@lustigmanfirm.com
> >X-OriginalArrivalTime: 02 Jun 2005 21:05:37.0381 (UTC)
> >FILETIME=[D3214950:01C567B6]
> >
> >Raymond,
> >
> >
> >
> >Attached are our comments for the creative.  Let me know if you have any
> >questions.  Please send me revised copy for my review and approval.
> >
> >
> >
> >Regards,
> >
> >
> >
> >Adam Z. Solomon
> >
> >The Lustigman Firm, P.C.
> >
> >149 Madison Avenue, Suite 805
> >
> >New York, NY 10016
> >
> >(212) 683-9180
> >
> >(212) 683-9181 (fax)
> >

> >adam@lustigmanfirm.com
> >
> >www.lustigmanfirm.com
> >
> >
> >
> >
> >
> >-----Original Message-----
> >From: Raymond Longino [mailto:rlongino@dircm.com]
> >Sent: Thursday, June 02, 2005 2:56 PM
> >To: Adam Solomon (E-mail)
> >Cc: Steve Decker (E-mail)
> >Subject: FW: New Skin On NSBA
> >
> >
> >
> >Adam,
> >
> >We want to try this for a one day test to see results.  Please approve
> >for the test.
> >
> >
> >
> >Raymond
> >
> >
> >
> >-----Original Message-----
> >From: Jon Goldstein [mailto:jon@impulsemg.com]
> >Sent: Thursday, June 02, 2005 12:34 PM
> >To: sdecker5@hotmail.com; Raymond Longino
> >Subject: New Skin On NSBA
> >
> >
> >
> >https://www.nsbaonline1.com
> >
>
>

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                                          : ss.
COUNTY OF NEW YORK       )

      PETER J. GLANTZ, being duly sworn says: I am not a party to the action, am over 18 years of age and reside in New York, New York.

      On January 23, 2006, I caused to be served a true copy of the annexed Declaration of Jeffrey Goldstein in Opposition to Defendant Direct Contact Media Inc.'s ("DCM") Motion to Dismiss Impulse Marketing Group, Inc.'s Amended Complaint as Against DCM; and the annexed Memorandum of Law in Opposition to Defendant Direct Contact Media Inc.'s ("DCM") Motion to Dismiss Impulse Marketing Group, Inc.'s Amended Complaint as Against DCM via Federal Express, addressed to the last known address of the addressee(s) as indicated below:

              Scott A. Shaffer, Esq.
              The Lustigman Firm, P.C.
              149 Madison Avenue, Suite 805
              New York, New York 10016-6713

                                    PETER J. GLANTZ

Sworn to before me this
23rd day of January, 2006

Notary Public

        TANYA R. DeROSE
     Notary Public, State of New York
         No. 03-4973858
      Qualified in New York County
   Commission Expires Nov. 19, 2006

00030596;1