UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

IMPULSE MARKETING GROUP, INC.,     :

             Plaintiff,     :  05 CV 7776 (KMK) (JCF)

                  :

     v.     :

                  :

NATIONAL SMALL BUSINESS ALLIANCE, INC.  :
and DIRECT CONTACT MEDIA, INC.,     :

                  :

             Defendants.     :

                  :  ECF CASE

                  :

------------------------------------------------------------------ X

## <u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DIRECT CONTACT MEDIA INC.'S ("DCM") MOTION TO DISMISS IMPULSE MARKETING GROUP, INC.'S AMENDED COMPLAINT AS AGAINST DCM</u>

Klein, Zelman, Rothermel & Dichter, L.L.P.
485 Madison Avenue
New York, New York 10022
(212) 935-6020

*Attorneys for Plaintiff*
*Impulse Marketing Group, Inc.*

{00075366;1}

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 4

ARGUMENT .......................................................................................... 8

I.    THE COURT CAN EXERCISE PERSONAL JURISDICTION OVER DCM ................. 8

    A.    DCM Is Bound To The Contract And The Forum Selection Clause Contained Therein ................................................................................ 8

        1.    The Forum Selection Clause Binds DCM Based Upon The Written Admissions And Other Verbal Representations To Impulse That DCM Assumed And/Or Adopted The Terms Of The Contract. ........................... 9

        2.    DCM Should Be Estopped From Repudiating The Forum Selection Clause ........................................................................................ 10

        3.    DCM Is Sufficiently "Closely Related" To NSBA To Justify Enforcement Of The Forum Selection Clause ................................................ 11

        4.    DCM Is Bound By The Contract And Hence Its Forum Selection Clause Because DCM Is NSBA's Alter Ego. ........................................... 13

        5.    Alternatively, Unresolved Factual Disputes Relating To Other Bases For Binding DCM To The Forum Selection Clause Contained In The Contract Require Discovery. ........................................................... 16

    B.    This Court Can Assert General Jurisdiction Over DCM ..................... 17

    C.    This Court Can Assert Specific Jurisdiction Over DCM ..................... 18

        1.    Due Process Considerations ................................................. 19

II.   IMPULSE PROPERLY PLEADED A CLAIM FOR BREACH OF CONTRACT PURSUANT TO RULE 12(B)(6) ........................................................... 20

    A.    DCM Expressly Adopted And/Or Assumed The Contract ................... 20

        1.    The Cases of Atari, Crabtree and Yucyco Are Entirely Distinguishable . 22

    B.    DCM Is NSBA's Alter Ego ............................................................ 22

III.  IMPULSE PROPERLY PLED QUASI-CONTRACT CLAIMS PURSUANT TO RULE 12(B)(6) ....................................................................................... 23

CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Statutes**

C.P.L.R. § 301 ........................................................................................................... 18

**Cases**

Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985) ............................. 9, 24

Apex Oil Co. v. Vanguard Oil Serv. Co., 760 F.2d 417 (2d Cir. 1985) ........................ 25

Atari, Inc. v. Games, Inc., No. 04 Civ. 3723, 2005 WL 447503 (S.D.N.Y. Feb. 24, 2005) .. 23, 25

Attorney Gen. of U.S. v. Irish N. Aid Comm., 530 F. Supp. 241 (S.D.N.Y. 1981) ..................... 10

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779 (2d Cir. 2000) ........... 22

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) ........................................ 22

Cheyenne Autumn Inc. v. Mine & Bill Baker Assoc., No. 94 Civ. 4001, 1995 WL 366388
    (S.D.N.Y. June 19, 1995) ........................................................................................ 22

Conley v. Gibson, 355 U.S. 41 (1957) ........................................................................ 23

Cornell v. Assicurazioni Generali S.P.A. Consolidated, No. 97 Civ. 2262, 2000 WL 284222
    (S.D.N.Y. Mar. 16, 2000) ........................................................................................ 19

Crabtree v. Tristar Automotive Group, Inc., 776 F. Supp. 155, 166 (S.D.N.Y. 1991) ................... 9

Cutco Indus., Inc. v. Naughton, 806 F.2d 361 (2d Cir. 1986) ................................... 20, 21

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060 (2d Cir. 1993) ......... 10, 11

Direct Mail Prod. Servs. Ltd. v. MSNA Corp., No. 99 Civ. 10550, 2000 WL 1277597 (S.D.N.Y.
    Sept. 7, 2000) ....................................................................................................... 12

Doehla v. Wathne Ltd., No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug.3, 1999) ............... 24

ESI, Inc. v. Coastal Corp., 61 F. Supp. 2d 35 (S.D.N.Y. 1999) ..................................... 24

Farrell Lines, Inc. v. Columbus Cello-Poly Corp., 32 F. Supp. 2d 118 (S.D.N.Y.1997) ............. 19

Filanto S.p.A. v. Chilewich Intern. Corp., 789 F. Supp. 1229 (S.D.N.Y. 1991) ........................ 10

Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ........................................... 15

Flick v. Stewart-Warner Corp., 76 N.Y.2d 50, 556 N.Y.S. 2d, 555 N.E.2d 907 (1990) .............. 18

Freeman v. Complex Computing Co., 119 F.3d 1044 (2d Cir. 1997) ......................................... 15

Harris Corporation v. McBride and Associates, Inc., No. 01-CV-0106E(F), 2002 WL 1677695, *4 (W.D.N.Y. July 19, 2002)................................................................................................. 24

HD Brous & Co., Inc., v. Mrzyglocki, No. 03 Civ. 8385, 2004 WL 376555 (S.D.N.Y. Feb. 26, 2004) .................................................................................................................................. 11

Hearst Corp. v. Goldberger, No. 96 Civ. 3620, 1997 WL 97097 (S.D.N.Y. Feb. 26, 1997) ....... 20

Hsin Ten Enter., Inc. v. Clark Enter., 138 F. Supp. 2d 449 (S.D.N.Y. 2000) ............................... 21

In re Ski Train Fir in Kaprun, Austria, 230 F. Supp. 2d 376 (S.D.N.Y. 2002)............................. 19

International Private Satellite Partners, L.P., v. Lucky Cat, 975 F. Supp. 483 (W.D.N.Y. 1997)8, 9

International Shoe Co. v. Washington, 326 U.S. 310 (1945) ......................................................... 22

Jackson v. Corporategear, LLC, No. 04 Civ. 10132, 2005 WL 3527148 (S.D.N.Y. Dec. 21, 2005) ................................................................................................................................... 14

Jenkins v. McKeithen, 395 U.S. 411, 421 (1969)......................................................................... 23

Koninklijke Philips Elecs. v. Digital Works, Inc., 358 F. Supp. 2d 328 (S.D.N.Y. 2005)........... 19

Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988) ................................................................................................................................... 21

LaBounty v. Adler, 933 F.2d 121 (2d Cir.1991) .......................................................................... 23

Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)..................................................................................................................................... 1

Marine Midland Bank, N.A. v. Miller, 664 F.2d 899 (2d Cir. 1981) ............................................ 8

Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154 (S.D.N.Y. 1988) ........................................ 15

New Moon Shipping Co. v. Man B & W Diesel AG, 121 F.3d 24-29 (2d Cir. 1997) ................... 8

Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 2d 175 (S.D.N.Y. 1995)................................ 21

Roby v. Corporation of Lloyd's, 996 F.2d at 1353 (2d Cir. 1993)................................................ 12

Rosenbloom v. Adams, Scott & Conway, Inc., 521 F. Supp. 372, aff'd, 688 F.2d 816 (2d Cir. 1981) ................................................................................................................................ 10, 24

Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974)............................................................. 11

Semi Conductor Materials, Inc. v. Citibank Int'l, P.L.C., 969 F. Supp. 2d 243 (S.D.N.Y. 1997) 20

**Sheiden Assocs., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37 (S.D.N.Y. 1991)**...................... 27

St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co., Ltd., 1997 WL 357989 (S.D.N.Y. June 26, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998) ................................................................. 20

Thomson-CSF, S.A. v. American Arbitration Association, 64 F.3d 773 (2d Cir. 1995) ............. 17

Wady v. Provident Life & Accident Ins. Co., 216 F. Supp. 2d 1060 (C.D. Cal. 2002) ............... 16

Warth v. Seldin 422 U.S. 490, 501 (1975)...................................................................... 23

Weingard v. Telepathy, Inc., No. 05 Civ. 2024, 2005 WL 2990645 (S.D.N.Y. Nov. 7, 2005) .. 12, 13

Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209 (S.D.N.Y. 1997)............................ 23, 25

## PRELIMINARY STATEMENT

Impulse Marketing Group, Inc. ("Impulse") respectfully submits this Memorandum of Law in opposition to defendant Direct Contact Media Inc.'s ("DCM") motion to dismiss Impulse's Amended Complaint as against it pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure ("Motion"). Impulse respectfully requests that this Court: (1) deny DCM's Motion in its entirety; or (2) alternatively, in the event the Court grants the Motion, dismiss the Amended Complaint as against DCM without prejudice, so that Impulse may either cure any pleading defects or refile against DCM in another jurisdiction;[1] and/or (3) grant such other and further relief that the Court considers proper.

### Personal Jurisdiction

This Court may also assert personal jurisdiction over DCM because: (1) DCM is bound to an express contract containing a New York forum selection clause; (2) Impulse sufficiently alleges that this Court can exercise general jurisdiction over DCM; and/or (3) Impulse has alleged facts demonstrating that this Court can assert specific jurisdiction over DCM.

### DCM Is Bound To An Express Contract Containing A Forum Selection Clause

This Court may exercise personal jurisdiction over DCM because, *inter alia*, DCM is bound to an express contract containing a New York forum selection clause,[2] which must be

---

[1] Impulse may seek permission from the Court to amend its Complaint for a second time to assert a tortious interference of contract claim against DCM based upon facts that have recently arisen which further demonstrate that DCM: (1) had knowledge of the existence of a valid contract between Impulse and National Small Business Alliance ("NSBA"); (2) intentionally induced NSBA to breach said contract without justification; and (3) damaged Impulse to a greater extent then originally anticipated. Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).

[2] The forum selection clause contained in the signed agreement at issue by and between Impulse and NSBA provides that, "the parties agree that the appropriate, convenient and exclusive venue for any action arising out of this Agreement shall be the court of appropriate jurisdiction in New York, New York." See Exhibit "A" annexed to the Declaration of Jeffrey Goldstein, dated January 13, 2006 (the "Goldstein Declaration") for a copy of said agreement. If this Court finds that it lacks jurisdiction over DCM, Impulse will be forced to bring duplicative lawsuits based upon the same transactions and occurrences. Moreover, even if dismissed, DCM will be actively involved in the discovery and litigation of this action.

enforced against DCM for four distinct reasons: (1) DCM has repeatedly admitted that it was a party to the contract at issue, both orally and in writing, in the context of discussing the transactions underlying said contract, and thus expressly assumed and/or adopted the obligations underlying the contract; (2) DCM, through its acts, is estopped from repudiating the forum selection clause contained in the contract at issue; (3) DCM is sufficiently "closely related" to NSBA to justify enforcement of the forum selection clause against it; and (4) DCM is NSBA's alter ego.

## General Jurisdiction

This Court maintains general jurisdiction over DCM based upon, *inter alia*, DCM's own representations that it continually does business in New York by: (1) delivering "business to business" and "business to consumer" marketing services for various New York-based businesses; (2) developing and implementing "large-scale marketing campaigns" for some of its New York-based "Fortune 100" clients through the DCM affiliate program, consisting of over thirty thousand (30,000) Internet marketers; and (3) consenting to jurisdiction in New York on other matters. (Am. Compl. ¶¶ 24-35.)

## Specific Jurisdiction

Moreover, Impulse has alleged facts demonstrating that this Court may obtain specific jurisdiction over DCM because, *inter alia*, DCM transacted business in New York in connection with the contract at issue including, but not limited to, providing DCM with thousands of New York resident leads, at DCM's explicit direction, that were generated from Impulse-run third party marketing campaigns so that DCM could promote products and/or services to New York residents.

### Due Process Considerations

Lastly, DCM has purposefully availed itself of the privilege of transacting business within New York, invoking the benefits and protections of its laws. Impulse's claims arose from DCM's purposeful availment so as not to offend traditional notions of fair play and substantial justice.

### Impulse Has Properly Pleaded A Breach of Contract Claim For Which Relief Can Be Granted

Impulse has pleaded a viable breach of contract cause of action against DCM sufficient to survive a Rule 12(b)(6) challenge because: (1) DCM has expressly assumed and/or adopted the contract at issue; and (2) DCM is NSBA's alter ego. While the general rule is that non-signatories cannot be bound by a contract, DCM falls within one or more of the recognized exceptions to this general rule.

### Impulse Has Properly Pled Breach of Quasi-Contractual Claims For Which Relief Can Be Granted

Moreover, Impulse has pleaded valid quasi-contractual claims against DCM sufficient to survive a Rule 12(b)(6) challenge because the general rule is that an express contract <u>between the same parties</u> bars recovery under alternative theories for events arising out of the same subject matter as the contract at issue. Here, DCM repeatedly maintains that it is not the same party to the contract at issue so the general rule does not apply.

### Procedural History

Impulse filed suit on September 2, 2005 against NSBA and DCM for breach of an express contract or, alternatively, quasi-contractual claims (the "Complaint"). On October 18, 2005, DCM requested a pre-motion conference to obtain this Court's permission to file a pre-Answer motion to dismiss Impulse's Complaint. By letter dated October 21, 2005, Impulse responded to DCM's request. The Court subsequently ordered that representatives for DCM and

Impulse attend a pre-motion conference.  Upon conferring with counsel for both parties, this Court permitted DCM to file its Motion.  On December 2, 2005, Impulse filed its Amended Complaint amplifying in significant detail DCM's extensive involvement in the transactions underlying this lawsuit.  On or about December 29, 2005, DCM moved to dismiss the Amended Complaint as against it with prejudice pursuant to Rule 12(b)(2) and 12(b)(6) arguing that: (1) Impulse cannot pierce the corporate veil under either New York or California law; (2) DCM's alleged involvement failed to bind it to an express contract entered into by and between NSBA and Impulse; (3) this Court lacked personal jurisdiction over DCM; and (4) Impulse's quasi-contractual causes of action failed as against DCM.

## STATEMENT OF FACTS

Impulse is an on-line marketing company that utilizes a network of affiliated entities to promote, market and sell various products and services, on behalf of third-party advertisers, through commercial e-mail and website-based advertisements. (Am. Compl. ¶ 5.)  NSBA is a membership-based association of small businesses and individuals that pools its collective resources to obtain discounts and services ordinarily offered only to large corporations.  (Am. Compl. ¶ 6.)

On or about April 26, 2005, Impulse and NSBA entered into a written Advertiser Insertion Order and Advertiser Master Terms and Conditions Agreement (collectively, the "Agreement"), whereby Impulse would provide certain on-line affiliate marketing services on behalf of NSBA for a fee.  (Am. Compl. ¶ 7.)  In an e-mail dated April 28, 2005, just two days after the Agreement was executed, DCM admitted that it was the real party in interest with respect to the Agreement in the context of discussing the specific transactions underlying the Agreement.  Specifically, DCM wrote to Impulse: "We [DCM] are looking forward to a long and

mutually successful partnership."[3]  (Am. Compl. ¶¶ 48, 71; Goldstein Declaration ¶ 6 and Exhibit "B.")

On June 3, 2005[4], just one month prior to the execution of the July 18, 2005 addendum to the Agreement, DCM admitted to Impulse in writing, for a second time, that DCM was "selling memberships in NSBA" and that Impulse was "doing the job" it "contracted with DCM to do." (Am. Compl. ¶ 67; Goldstein Declaration ¶ 7 and Exhibit "C.")  On or about July 18, 2005, Impulse and NSBA entered into an Addendum to the Agreement (the "Addendum").  (Am. Compl. ¶ 8.)  The Agreement and Addendum (collectively, the "Contract") granted Impulse the right to hold NSBA's agents jointly and severally liable for all amounts due under the Contract. (Am. Compl. ¶ 10.)  Pursuant to the Contract, Impulse placed advertisements associated with NSBA products and/or services throughout Impulse's network of affiliated websites[5], within commercial e-mails transmitted to Impulse's proprietary database of e-mail addresses and to the databases of its affiliate marketing partners. (Am. Compl. ¶ 11.)  On-line users that responded to these advertisements were directed to a website designated by Impulse that contained registration applications for products and/or services.  (Am. Compl. ¶ 11.)  In accordance with the Contract, Impulse was to be compensated each time an on-line user completed a registration application for a particular NSBA product and/or service on the website(s) designated by Impulse (each such

---

[3] It is indisputable that Raymond Longino ("Longino"), the Chief Operating Officer of DCM, was referring to the Agreement itself.  This is evidenced by the context of the e-mail communications between Impulse and DCM. However, assuming such an inference is disputed, factual discovery would be warranted to determine the intent and meaning of such an admission.

[4] The two (2) DCM written admissions will hereinafter be collectively referred to as the "Written Admissions."  Further, the Amended Complaint misstates the dates of the Written Admissions.  Impulse has subsequently verified the dates of the Written Admissions and has annexed them to the Goldstein Declaration as Exhibit "B."

[5] Impulse relied to its detriment on DCM's obligations, representations and commitments to pay for the on-line affiliate marketing services provided by Impulse to DCM.  Impulse pre-paid its affiliate marketing partners approximately one million dollars ($1,000,000.00), of which six hundred eighty thousand dollars ($680,000) of Impulse's fixed costs has never been repaid. (Am. Compl. ¶ 102.) (Goldstein Declaration ¶ 10.)

on-line user hereinafter referred to as a "Lead"). (Am. Compl. ¶ 12.) Impulse was responsible for identifying and compiling a list of all Leads and sending such lists to <u>both</u> NSBA and DCM. NSBA and DCM accepted the services provided by Impulse. (Am. Compl. ¶ 12.)

Pursuant to the Contract, Impulse was also to be paid a fee for the sale of products and/or services to any and all on-line users that responded to Impulse-placed advertisements but did not properly complete the associated registration application on the website(s) designated by Impulse (each such on-line user hereinafter referred to as a "Non Complete"). (Am. Compl. ¶ 14.)

Notwithstanding the fact that the signatories to the Contract were NSBA and Impulse, DCM representatives, particularly Longino and Michael Holleran ("Holleran"), owner, director, shareholder and/or principal of DCM: (1) provided Impulse with the Written Admissions and further admitted orally, that it assumed and/or adopted the obligations underlying the Contract; (2) micro-managed all aspects of the transactions underlying the Contract; (3) transmitted and received scores of e-mail relating to the Contract; (4) explicitly directed each transaction underlying the Contract; (5) approved the advertising content and creative material that was to be used in connection with the Contract: (6) reviewed and revised the Impulse-run website terms and conditions; (7) directed that DCM, rather than NSBA, be provided with Non Completes for DCM to market on its own; (8) specifically instructed Impulse, at all times, to send the lists of Leads and Non-Completes to a server owned and operated by DCM; and (9) having received the benefits of the Contract, DCM compensated Impulse, on DCM-issued corporate checks, for both Leads and Non Completes, in furtherance of the terms of the Contract. (Am. Compl. ¶ 64.)

<u>New York Contacts</u>

<u>DCM Website Admissions</u>

On its website and elsewhere, DCM admits, *inter alia*, that: (1) it "delivers marketing campaigns utilizing a multi-channel network of outsourced call centers, broadcast media, print

and direct mail" and has helped "Fortune 100 companies" "create, develop, implement and manage large-scale direct marketing campaigns" through "thirty thousand (30,000) Internet affiliate marketers;" and (2) it delivers "business to business" and "business to consumer" marketing services for various New York-based businesses and clientele. (Am. Compl. ¶¶ 24-35.)

<u>DCM's Failure To Deny Specific Allegations Regarding Its Contacts with New York</u>

In addition to the above representations made by DCM, DCM does not and cannot deny the Written Admissions made to Impulse. Moreover, DCM does not and cannot specifically deny that: (1) DCM-related information is inevitably exchanged between the DCM website operator and New York-based businesses and/or New York-based residents/consumers; (2) DCM solicits business in New York by promoting its own marketing services to New York-based businesses; (3) DCM accepts client orders for its own marketing services from New York-based businesses and derives substantial revenue from New York residents/consumers that purchase its New York-based clients' products and/or services through marketing campaigns run by DCM on behalf of its New York-based clientele; (4) DCM has consented to jurisdiction in New York courts when it registered for the domain and URL located at www.dircm.com; (Am. Compl. ¶¶ 24-35.); (5) tens of thousands of individuals that reside in the State of New York visited the Impulse-run website(s) in connection with the transactions and services performed under the Contract; (6) of the tens of thousands of individuals that visited the Impulse-run website(s), hundreds or thousands of individuals became DCM Leads or Non Completes; (7) DCM promoted and marketed products and/or services to individuals that reside in New York and compensated Impulse for providing DCM with thousands of Non Completes generated from individuals that reside in New York; and (8) at the explicit direction of DCM, Impulse further provided DCM with thousands of New York resident Leads that were generated from Impulse-

run third party marketing campaigns so that DCM could promote products and/or services. (Am. Compl. ¶¶ 24-41.)

**ARGUMENT**

**I.    THE COURT CAN EXERCISE PERSONAL JURISDICTION OVER DCM**

This Court can assert personal jurisdiction over DCM because: (1) DCM is bound to an express contract containing a New York forum selection clause; (2) Impulse sufficiently alleges that this Court can exercise general jurisdiction over DCM; and/or (3) Impulse has alleged facts demonstrating that this Court can assert specific jurisdiction over DCM.

At the initial stage of litigation, a party seeking to establish jurisdiction need only make a prima facie showing by alleging facts which, if true, would support the court's exercise of jurisdiction. New Moon Shipping Co. v. Man B & W Diesel AG, 121 F.3d 24-29 (2d Cir. 1997) (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)). Accordingly, the facts must be viewed in the light most favorable to the plaintiff, and a disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing. Id. Given that there has been no discovery in this case, Impulse may defeat DCM's Motion "based upon legally sufficient allegations of jurisdiction." International Private Satellite Partners, L.P., v. Lucky Cat, 975 F. Supp. 483, 485 (W.D.N.Y. 1997).

**A.    DCM Is Bound To The Contract And The Forum Selection Clause Contained Therein**

It is well-established that a "range of participants, parties and non-parties, should benefit from and be subject to forum selection clauses." Lucky Cat, 975 F. Supp. at 485. The Contract's New York forum selection clause may be enforced against DCM for four distinct reasons: (1) DCM provided Impulse with the Written Admissions and other verbal representations, that it was a party to the Contract in the context of discussing the transactions

underlying the Contract, and thus expressly assumed and/or adopted the Contract; (2) DCM is estopped from repudiating the forum selection clause contained in the contract; (3) DCM is sufficiently "closely related" to NSBA to justify enforcement of the forum selection clause; and (4) DCM is NSBA's alter ego.

1.    The Forum Selection Clause Binds DCM Based Upon The Written Admissions And Other Verbal Representations To Impulse That DCM Assumed And/Or Adopted The Terms Of The Contract.

As a general rule, a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract. Crabtree v. Tristar Automotive Group, Inc., 776 F. Supp. 155, 166 (S.D.N.Y. 1991).[6]  Under New York law, a written contract need not be signed to being binding against a party, so long as that party indicates through performance of its terms and/or other unequivocal acts and receipt of the benefits under the Contract that it intends to adopt, or has adopted, the contract.  Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985).  Further, when it is expressly stated and clearly understood that those who sign a contract will be bound, the absence of one or more signatures will not preclude a finding that a valid agreement has been entered into by the signatories.  Rosenbloom v. Adams, Scott & Conway, Inc., 521 F. Supp. 372, aff'd, 688 F.2d 816 (2d Cir. 1981).

Here, DCM assumed the terms of the Contract by providing Impulse with the Written Admissions[7] as well as other verbal representations that it was bound to the Contract and its terms.  (Am. Compl. ¶ 24; Goldstein Declaration ¶¶ 5-7.)  Further, DCM's performance under the Contract and DCM's unequivocal acts in connection with transactions underlying the

---

[6] The issue of non-signatory liability will be addressed in Section II, supra.

[7] Papers written on letterhead, those signed by representatives and those that were unsigned but clearly emanating from representatives, are not hearsay because they constitute admissions by defendant.  Attorney Gen. of U.S. v. Irish N. Aid Comm., 530 F. Supp. 241, 252 (S.D.N.Y. 1981).

Contract bind it to the Contract and its forum selection clause. Given that DCM expressly adopted and/or assumed the Contract and thus its forum selection clause,[8] this Court can exercise personal jurisdiction over DCM in New York.

　　　　2.　　DCM Should Be Estopped From Repudiating The Forum Selection Clause.

It is well established that a party may be bound by an agreement to arbitrate even in the absence of a signature based on ordinary principles of contract and agency. Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993); HD Brous & Co., Inc., v. Mrzyglocki, No. 03 Civ. 8385, 2004 WL 376555, at *6 (S.D.N.Y. Feb. 26, 2004).[9]

In both HD Brous and Deloitte Noraudit A/S, the courts concluded that non-signatories to arbitration agreements were estopped from denying obligations to arbitrate where the non-signatory party received and accepted "direct" benefits from a contract containing an arbitration clause. The instant matter is similar to HD Brous and Deloitte Noraudit A/S because Impulse alleges facts tending to show, inter alia, that DCM, through its words, deeds and conduct, knowingly received and accepted "direct" benefits under the Contract. Specifically, Impulse alleges that: (1) substantially all of the Non Completes relating to the Contract were transmitted to DCM at its explicit direction thereby allowing DCM to then market each of these Non Completes directly; (2) DCM demanded and received a "pipeline" report on behalf of NSBA

---

[8] In Filanto S.p.A. v. Chilewich Intern. Corp., 789 F. Supp. 1229 (S.D.N.Y. 1991), the court concluded that a letter from an Italian footwear manufacturer to a New York export-import firm expressly relying on a section of a contract with a Russian buyer, which manufacturer had earlier purported to exclude from an agreement with the firm, was an admission in law by the manufacturer that other relevant clauses of the contract with the buyer, including an agreement to arbitrate in Russia, were incorporated into the agreement and made part of their bargain. Moreover,

[9] Although such precedent relates to enforcement of arbitration clauses against a non-signatory, the above-mentioned cases are highly relevant to this Motion because the United States Supreme Court has held that arbitration clauses are merely specialized types of forum selection clauses. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974).

from the applicable billing processor that was used to process payment by those individuals/consumers that purchased products and/or services at an Impulse-related website via a credit card; and (3) DCM representatives represented to Impulse that DCM would make payments on behalf of NSBA for services rendered and received pursuant to the Contract. (Am. Compl. ¶¶ 15, 38, 72, 77.) Impulse relied to its detriment on DCM's representations and conduct by pre-paying its affiliate marketers one million dollars ($1,000,000.00). Based on DCM's words, deeds and conduct, DCM cannot repudiate the forum selection clause contained in the Contract.

> 3.    DCM Is Sufficiently "Closely Related" To NSBA To Justify Enforcement Of The Forum Selection Clause.

The test to determine whether a non-signatory to a contract can be bound by a forum selection clause is whether it is "closely related" to one of the signatory contracting parties. Direct Mail Prod. Servs. Ltd. v. MSNA Corp., No. 99 Civ. 10550, 2000 WL 1277597, at *3 (S.D.N.Y. Sept. 7, 2000). In particular, the relationship between the non-party and the signatory must be sufficiently close so that enforcement of the forum selection clause is "foreseeable" by virtue of the relationship between the signatory and the party sought to be bound. Id. "Closely related" is broadly defined to encompass those non-signatory parties against whom enforcement of the clause is foreseeable. Id. Furthermore, a non-party/non-signatory to a contract is deemed "closely related" to a dispute if its interests are "completely derivative" of and "directly related to," if not predicated upon, the signatory party's interest or conduct. Weingard v. Telepathy, Inc., No. 05 Civ. 2024, 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 7, 2005). Third-party beneficiaries to a contract would, by definition satisfy this requirement. Roby v. Corporation of Lloyd's, 996 F.2d at 1353 (2d Cir. 1993).

In Telepathy, the court concluded that defendants Telepathy, Inc., Snapnames.com and Namebay S.A.M. were closely enough related to defendant Network Solutions, Inc., the signatory to a registration agreement between it and plaintiff, to enforce a forum selection clause against the three non-signatories because the non-signatories "acted in concert" to deprive plaintiff of his domain name that he had acquired through the registration agreement with defendant Network Solutions, Inc. Telepathy, Inc., 2005 WL 2990645, at *6. The instant case is highly similar in that DCM acted in concert with NSBA to deprive Impulse out of payments due and owing under the Contract.

It Was Foreseeable to DCM That The Forum Selection Clause Would Be Binding Upon It

Here, Impulse alleges facts showing that DCM is "closely related" to NSBA and that it was "foreseeable" to DCM that the Contract, and its forum selection clause, would be binding upon it. (Am. Compl. ¶ 55.) Such factual allegations demonstrate that DCM's interests are "completely derivative" of and "directly related to," if not predicated upon, NSBA's conduct under the Contract. For example, Impulse alleges that: (1) at various points DCM represented itself to be the real party in interest with respect to the Contract by providing Impulse with the Written Admissions and other verbal representations that is was a party to the Contract in the context of discussing the underlying transactions to the Contract; (2) DCM and NSBA share common executive(s), officers and ownership; (3) Impulse was motivated to enter into the Contract based on Impulse's desire and intent to confer a pecuniary benefit on NSBA-related companies and agents in the form of Leads and Non Completes[10]; (4) NSBA and DCM acted in concert to deprive Impulse of monies due and owing to it under the Contract; and (5) DCM made

---

[10] The Contract grants Impulse the right to hold NSBA's "agents" (i.e., DCM) jointly and severally liable for all amounts due under the Contract.

payments on behalf of NSBA for services rendered pursuant to the Contract.[11] (Am. Compl. ¶¶ 49, 57, 63, 64, 66.) For DCM to contend that it and NSBA are not "closely related," or that its interests are not "directly related" to NSBA's interests, is untrue and an issue to be determined by the trier of fact. Based on the foregoing, this Court can exercise personal jurisdiction over DCM pursuant to the New York forum selection clause contained in the Contract because DCM is "closely related" to NSBA.

> 4.    DCM Is Bound By The Contract And Hence Its Forum Selection Clause Because DCM Is NSBA's Alter Ego.

Although the corporate form generally must be respected, it will be disregarded whenever necessary to prevent fraud or achieve equity. Jackson v. Corporategear, LLC, No. 04 Civ. 10132, 2005 WL 3527148, at *2 (S.D.N.Y. Dec. 21, 2005). To pierce the corporate veil under New York law, a plaintiff must show that: (1) the owner exercised such control over the corporation that the latter became a "mere instrumentality" of the former; (2) the owner used this control to commit a fraud or other wrong; and (3) the fraud or wrong resulted in injury to the plaintiff. Id. The veil-piercing inquiry is fact-specific and this Court must weigh the following factors: (1) a disregard of corporate formalities; (2) an intermingling of funds; (3) payment or guaranty of a corporation's debts by the dominating entity; (4) an intermingling of property between the entities; (5) an overlapping of ownership and management[12]; and (6) whether the

---

[11] By way of example, on June 17, 2005, DCM issued a check to Impulse in the amount of $21,690.00, representing $20,105.00 for a second installment payment due and owing to Impulse (less $140.00 in wire fees), plus $1,725.00 for Impulse-generated Non Completes in accordance with the explicit terms of the Contract. On June 20, 2005, DCM issued a check to Impulse in the amount of $2,655.00, representing payment due and owing to Impulse for Impulse-generated Non Completes in accordance with the transactions underlying the Contract. On June 23, 2005, DCM issued a check to Impulse in the amount of $19,788.00, representing $11,668.00 for a second installment payment due and owing to Impulse (less $160.00 in wire fees), plus $8,280.00 for Impulse-generated Non Completes in accordance with the transactions underlying the Contract. (Am. Compl. ¶¶ 51-53.) There is no plausible reason why DCM would have compensated Impulse had it not received any "direct" benefit under the Contract.

corporations are treated as independent profit centers. <u>Freeman v. Complex Computing Co.</u>, 119 F.3d 1044, 1053 (2d Cir. 1997).

Impulse sufficiently alleges that not only did DCM dominate NSBA, but DCM: (1) intermingled funds with NSBA; (2) paid and guaranteed payment of NSBA's debts under the Contract; (3) intermingled proprietary property in the form of Lead and Non Complete data with NSBA; and (4) treated NSBA as its related profit center. (Am. Compl. ¶¶ 62-84.)

Such facts further demonstrate that DCM exercised such control over NSBA that NSBA became a "mere instrumentality" of DCM and that DCM used this control to injure Impulse by: (1) failing to compensate Impulse for monies due and owing under the Contract; and (2) by diverting proceeds from the Contract from NSBA to DCM. Impulse further alleges that DCM repeatedly admitted to Impulse that DCM was the real party in interest. (Am. Compl. ¶¶ 43, 66.) The fact that NSBA and DCM are incorporated in two different states, as DCM argues, is not dispositive of the fact that DCM operated, with respect to the transactions underlying the Contract, as a single economic entity.

DCM relies on, <i>inter alia</i>, <u>Mellencamp v. Riva Music Ltd.</u>, 698 F. Supp. 1154 (S.D.N.Y. 1988), to argue that Impulse should not be able to pierce the corporate veil. <u>Riva Music Ltd.</u> is entirely distinguishable from the instant case because Impulse sufficiently alleges facts well beyond the mere existence of common ownership and/or executives between DCM and NSBA. (<u>See e.g.</u>, Am. Compl. ¶¶ 62-84.)

---

[12] There are several factual allegations contained in the Amended Complaint that are in direct dispute with DCM's contentions. By way of just one example, in Longino's Declaration dated October 11, 2005, (the "Longino Declaration"), he swears, under penalties of perjury, that DCM "has no executives or employees in common with NSBA." (Longino Declaration ¶ 13.) In stark contrast to the Longino Declaration, Impulse alleges that DCM and NSBA shared, at least at some point in time, common executive(s), officers and ownership. (Am. Compl. ¶ 63.)

<u>Application of California Law Yields The Same Result as New York Law</u>

California law may apply in establishing jurisdiction over DCM under an alter ego theory. <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995). The choice of law provision contained in the Contract calls for the application of New York law. Even if, as DCM alternatively argues, California law applies, an alter ego analysis of the factual allegations contained in the Amended Complaint will yield the same result under California law as in New York. California courts look to, *inter alia*, whether the acts are treated as those of one corporation. <u>Wady v. Provident Life & Accident Ins. Co.</u>, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. 2002).

DCM contends that Impulse's Amended Complaint fails to allege a lack of separateness between NSBA and DCM. We respectfully direct this Court to the allegations contained in the Amended Complaint and to the analysis of piercing the corporate veil under New York law as set forth hereinabove. (Am. Compl. ¶¶ 62-84.)

DCM maintains that Impulse has not alleged that any inequitable result would arise if it were to proceed only against NSBA. To the contrary, Impulse alleges that DCM diverted proceeds due and owing to Impulse under the Contract from NSBA to DCM. (Am. Compl. ¶ 64.) As such, it would be extremely unfair for Impulse to proceed only against NSBA as DCM and NSBA, acting in concert and as a single entity, significantly injured Impulse.

Based on the foregoing, DCM is bound by the Contract and hence the forum selection clause contained in the contract because DCM is NSBA's alter ego under either New York or California law.

5.    <u>Alternatively, Unresolved Factual Disputes Relating To Other Bases For
Binding DCM To The Forum Selection Clause Contained In The Contract
Require Discovery.</u>

Even if DCM had not repeatedly admitted to the existence of the Contract, there remain

unresolved factual disputes relating to other bases for binding DCM to the forum selection clause

contained in the Contract that require discovery.  The case of <u>Thomson-CSF, S.A. v. American</u>

<u>Arbitration Association</u>, 64 F.3d 773, 776 (2d Cir. 1995), relied upon by DCM on page 8 of its

own Memorandum of Law, stands for, *inter alia*, the general principle that the there are several

theories under which non-signatories may be bound to contracts, forum selection clauses and

arbitration clauses.  Such theories include, but are not limited to, binding a non-signatory to an

agreement: (1) when that party has entered into a separate contractual relationship with the non-

signatory which incorporates the existing forum selection or arbitration clause; (2) when the non-

signatory's subsequent conduct indicates that it is assuming the obligation to be bound by the

forum selection or arbitration clause; and/or (3) when the non-signatory is an agent of the party

bound by the forum selection or arbitration clause.  <u>Id</u>.  These theories arise out of common law

principles of contract and agency law.  <u>Id</u>.  In this regard, there are several disputed factual

allegations that remain unanswered that would ultimately bind DCM to the Contract.  By way of

example, DCM admits (in bold print no less) that "the relationship between co-defendants NSBA

and DCM is based strictly in contract."  Assuming such an assertion to be true, there are several

factual issues that need to be resolved through the discovery process including, but not limited

to, the following: (1) whether said contract between NSBA and DCM incorporated by reference

the forum selection clause contained in the Contract and/or the Contract itself; (2) whether DCM

was assigned the Contract in NSBA's stead pursuant to the NSBA/DCM agreement, as well as

the forum selection clause therein, on behalf of NSBA; and (3) whether NSBA contractually

designated DCM as its agent for purposes of the transactions underlying the Contract. These questions are not random speculation, inasmuch as DCM has repeatedly admitted, at a minimum, that it has a contractual relationship with Impulse. Accordingly, discovery may resolve these issues.

**B.    This Court Can Assert General Jurisdiction Over DCM**

Under New York C.P.L.R. § 301, a foreign corporation is subject to a court's general jurisdiction if the company is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence. Flick v. Stewart-Warner Corp., 76 N.Y.2d 50, 556 N.Y.S. 2d, 555 N.E.2d 907 (1990).

The facts set forth hereinabove and in paragraphs 24 through 35 of the Amended Complaint, demonstrate that DCM, on its website[13] and elsewhere (including, but not limited to, oral and representations/admissions to Impulse indicating that DCM has clientele in New York), that DCM does business in New York such as DCM's own admission that it delivers marketing campaigns to "Fortune 100 companies" through its affiliate base of over "thirty thousand (30,000) Internet marketers." (Am. Compl. ¶ 35.) It would logically follow that: (1) all of DCM's thirty thousand (30,000) Internet marketing affiliates continuously and systematically promote products and/or services to New York residents/consumers on DCM's behalf; (2) thousands of these Internet marketing partners are New York-based businesses; (3) DCM continuously and systematically executes contracts with these thirty thousand (30,000) marketing affiliates to provide marketing services to New York residents and consumers; and (4) dozens of DCM's Fortune 100 clientele are New York-based companies with whom DCM has contracted.

---

[13] DCM contends that its website was Impulse's "main basis" for exercising general jurisdiction over DCM. However, a quick reading of Impulse's Amended Complaint clearly demonstrates that Impulse pleaded numerous factual allegations against DCM to assert jurisdiction over it and did not simply rely on the content contained on the DCM website as its "main basis" of asserting personal jurisdiction over DCM. (Am. Compl. ¶¶ 24-35.)

One criterion that a court must weigh in determining whether a non-domiciliary is doing business in New York is whether the foreign person has consented to jurisdiction in New York. Koninklijke Philips Elecs. v. Digital Works, Inc., 358 F. Supp. 2d 328 (S.D.N.Y. 2005). On page 16 of DCM's Memorandum of Law, DCM maintains that it has not consented to jurisdiction in New York. However, DCM has consented to jurisdiction in New York courts in other matters when it registered for the domain and URL located at www.dircm.com. (Am. Compl. ¶ 35.) In Farrell Lines, Inc. v. Columbus Cello-Poly Corp., 32 F. Supp. 2d 118, 127 (S.D.N.Y.1997), the court held that an enforceable forum selection clause amounts to consent to personal jurisdiction.

DCM cites to In re Ski Train Fir in Kaprun, Austria, 230 F. Supp. 2d 376 (S.D.N.Y. 2002), Cornell v. Assicurazioni Generali S.P.A. Consolidated, No. 97 Civ. 2262, 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) and Hearst Corp. v. Goldberger, No. 96 Civ. 3620, 1997 WL 97097, at *8 (S.D.N.Y. Feb. 26, 1997), to argue that the DCM website is insufficient to support the exercise of jurisdiction over DCM. However, these cases are entirely distinguishable from the case at bar because, unlike those cases, Impulse does not solely rest on the DCM website to attain general jurisdiction over DCM. Based on the foregoing, DCM is continuously and systematically doing business in New York so as to be deemed "present" in New York.

## C.    This Court Can Assert Specific Jurisdiction Over DCM

The relevant long-arm section to this matter is C.P.L.R. 302(a)(1). "To establish jurisdiction under C.P.L.R. 302(a)(1), the plaintiff must show that the defendant transacted business within the state and that the cause of action arose from that transaction." Cutco Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986); St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co., Ltd., 1997 WL 357989, at *3 (S.D.N.Y. June 26, 1997), aff'd, 152 F.3d 920 (2d Cir. 1998). "Under this standard, a defendant who 'transacts business' in New York will be subject to

jurisdiction 'so long as the acts were purposeful and there is a substantial relationship between those acts and the plaintiff's claim.'" Semi Conductor Materials, Inc. v. Citibank Int'l, P.L.C., 969 F. Supp. 243, 246 (S.D.N.Y. 1997) (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 43, 527 N.Y.S.2d 195 (1988)); Cutco Indus., 806 F.2d at 365. "A court must consider the totality of the defendant's acts to determine whether the defendant has performed purposeful acts in New York in connection with the transaction from which the cause of action arises." Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 2d 175, 179 (S.D.N.Y. 1995).

Impulse has alleged facts demonstrating that this Court can obtain specific jurisdiction over DCM because, *inter alia*, DCM transacted business in New York in connection with the Contract including, but not limited to, providing DCM with thousands of New York resident Leads, at DCM's explicit direction, that were generated from Impulse-run third-party marketing campaigns so that DCM could promote products and/or services to New York residents. DCM fails to specifically deny such an allegation. Considering the totality of DCM's acts, conduct and admissions as set forth in the Amended Complaint and hereinabove DCM has performed purposeful acts in New York in connection with the transaction from which Impulse's claims arise. Assuming these allegations to be true and construing the Amended Complaint in a light most favorable to Impulse, this Court can exercise specific jurisdiction over DCM.

1.    Due Process Considerations

"If jurisdiction is appropriate under state law, a court must then determine whether the exercise of that jurisdiction satisfies the requirements of due process." Hsin Ten Enter., Inc. v. Clark Enter., 138 F. Supp. 2d 449, 455 (S.D.N.Y. 2000) (citing Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 2000)). Due process requires that a defendant have minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v.

{00075366;1}                                    19

Washington, 326 U.S. 310, 316 (1945).  A plaintiff bears the burden of demonstrating that the non-domiciliary defendants purposely availed "themselves of the privilege of transacting business within the forum state, invoking the benefits and protections of its laws" and that the cause of action arose from that availment. Cheyenne Autumn Inc. v. Mine & Bill Baker Assoc., No. 94 Civ. 4001, 1995 WL 366388, at *2 (S.D.N.Y. June 19, 1995) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

Based upon DCM's conduct, its repeated admissions and its acts complained of in the Amended Complaint and detailed throughout this Memorandum of Law, DCM has purposefully availed itself of the protections and privileges of transacting business in New York with respect to the transactions underlying the Contract and this lawsuit.

## II.    IMPULSE PROPERLY PLEADED A CLAIM FOR BREACH OF CONTRACT PURSUANT TO RULE 12(B)(6)

The well-established standard for a motion to dismiss requires a court to assume that "for purposes of a motion to dismiss, a complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true." Warth v. Seldin, 422 U.S. 490, 501 (1975); Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). "A motion to dismiss should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "The court also must read the complaint generously and draw reasonable inferences in favor of the pleader." LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991).

### A.    DCM Expressly Adopted And/Or Assumed The Contract

Impulse recognizes the general principle that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it is in privity with the plaintiff or has thereafter assumed or been assigned the contract. Atari, Inc. v. Games, Inc., No. 04 Civ. 3723,

2005 WL 447503, at *3 (S.D.N.Y. Feb. 24, 2005); Yucyco, Ltd. v. Republic of Slovenia, 984 F.

Supp. 209 (S.D.N.Y. 1997). DCM's conduct falls within the clear exceptions to this rule.

Assumption and/or adoption of an agreement can be either express or implied through

unequivocal acts. National Video, 610 F. Supp. at 612. Under New York law, a written contract

need not be signed to be binding against a party, so long as that party indicates through

performance of its terms or other unequivocal acts that it intends to adopt or assume the contract.

Id. When it is expressly stated and clearly understood that those who sign a contract will be

bound, the absence of one or more signatures will not preclude a finding that a valid agreement

has been entered into by the signatories. Adams, Scott & Conway, Inc., 521 F. Supp. 372.

In ESI, Inc. v. Coastal Corp., 61 F. Supp. 2d 35, 74 (S.D.N.Y. 1999), the court held that

the allegations of the Second Amended Complaint made it clear that other documentary evidence

established that there was an assumption of an agreement. See also Doehla v. Wathne Ltd., No.

98 Civ. 6087, 1999 WL 566311, at *6 (S.D.N.Y. Aug.3, 1999) (where, in the context of a joint

venture agreement, "writings" may together constitute an assumption and/or privity of a

contract). In the case of Harris Corporation v. McBride and Associates, Inc., No. 01-CV-

0106E(F), 2002 WL 1677695, *4 (W.D.N.Y. July 19, 2002), defendant McBride admitted to the

existence of the contract at issue and made several payments in reduction of its debts under the

contract. The court concluded that McBride was liable under the contract for the amount due

thereunder. See also Apex Oil Co. v. Vanguard Oil Serv. Co., 760 F.2d 417, 422 (2d Cir. 1985)

(asserting that "the existence of a contract may be established through the conduct of the parties

recognizing the contract."). Here, not only has DCM repeatedly admitted that it was a party to

the Contract, both orally and in writing, but DCM's conduct and unequivocal acts in connection

with the Contract including, an assumption of payment obligations under the Contract and a

diversion of the benefits under the Contract to itself rather than NSBA, demonstrate that DCM expressly assumed the Contract and should be liable thereunder. (Am. Compl. ¶¶ 48, 49, 67, 71.)

1.    The Cases of Atari, Crabtree and Yucyco Are Entirely Distinguishable

Unlike Atari, Crabtree and Yucyco, which held that non-signatories were not bound by a contract, the case at bar involves repeated express admissions that a non-signatory assumed a contract.   In Atari, for example, there is no indication that Atari Interactive assumed any obligations under the agreement, made payments under the agreement, received benefits under the agreement or, of most importance, admitted to having a contractual relationship with Games, Inc. Crabtree similarly lacks any assumption of obligations, receipt of benefits, or recognition of a contractual relationship.   Here, Impulse has sufficiently alleged that, *inter alia,* DCM has assumed many of the obligations contained under the Contract including, but not limited to, payment obligations under the Contract.   In Yucyco, the court relied on international law in rendering its opinion and plaintiff solely relied on the fact that Slovenia exercised "general" control over the day-to-day activities of the Slovenian banks.   In contrast, Impulse alleges many additional facts tending to show that not only did DCM exercise "general" control over the transactions under the Contract, but that DCM specifically micro-managed the daily activities as if DCM and NSBA were one and the same.   More significantly, Yucyco is further distinguishable because there the plaintiff failed to plead facts tending to show alter ego liability. Again, such a fact pattern is entirely distinguishable from the case at bar in light of Impulse's well-pleaded facts tending to show alter ego liability on the part of DCM.   Accordingly, Impulse has asserted a viable breach of contract action against DCM pursuant to Rule 12(b)(6).

**B.    DCM Is NSBA's Alter Ego**

An alter ego theory of liability can also be used to hold DCM liable under the Contract. In this regard, Impulse sufficiently alleges specific facts tending to show that DCM:

(1) disregarded corporate formalities with NSBA; (2) intermingled funds with NSBA; (3) shared, and continues to share, common ownership, officers and personnel with NSBA[14]; (4) guaranteed and paid NSBA's corporate debts arising from the transactions under the Contract; (5) "dominated" NSBA; (6) used such domination to commit a fraud or wrong against Impulse; and (7) acted as NSBA's agent with respect to the transactions underlying the Contract.  (Am. Compl. ¶¶ 62-84.)

For purposes of brevity, Impulse will rely on its arguments set forth in Section I.A(4) hereinabove.

## III.    IMPULSE PROPERLY PLED QUASI-CONTRACT CLAIMS PURSUANT TO RULE 12(B)(6)

DCM maintains that Impulse's quasi-contractual causes of action must fail because there is a valid and enforceable contract covering the same subject matter of the contract at issue. This general rule applies because it would be unfair to permit a party to recover damages against the same party for the exact performance under both quasi-contract and express contract claims. However, Impulse can maintain its quasi-contractual causes of action against DCM because DCM has steadfastly represented that it was a stranger to the Contract, even through the Contract arises out of the same subject matter as the instant dispute.  If that is in fact the case, it would require "the existence of an express contract *between the parties* [to bar] recovery under alternative theories for events arising out of the same subject matter as that contract." Sheiden Assocs., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37 (S.D.N.Y. 1991) (emphasis supplied.). This proposition differs significantly from the one advanced by DCM, to wit, that the existence of a valid contract on the same subject bars quasi-contract relief as a matter of law, even from parties not bound by that contract.  Further, such a premise is not supported by the logic of the

---

[14] This factual allegation is in direct conflict with paragraph 13 of the Longino Declaration.

equitable doctrine of quantum meruit which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from those parties.

Based on the foregoing and the allegations contained in the Amended Complaint, Impulse has pleaded valid quasi-contractual claims against DCM sufficient to survive a Rule 12(b)(6) challenge.[15]

---

[15] On the one hand, DCM contends that it should not be bound by the Contract, and on the other hand, DCM maintains that Impulse's quasi-contract claims are not valid based upon the existence of the Contract. Assuming such logic, Impulse would be left with no basis of recovery against DCM whatsoever. Furthermore, Impulse has sufficiently alleged facts tending to show all of the elements for recovery under quasi-contractual theories. Specifically, by its words and actions, DCM: (1) impliedly agreed to pay Impulse for the services provided to NSBA in exchange for the Leads and Non-Completes that it received from Impulse; (2) relied to its detriment in pre-paying its affiliate marketing partners; and (3) breached its implied contractual relationship with Impulse by failing to pay for services when payment came due. Had Impulse known that DCM would not fully compensate it, Impulse would not have expended time, effort and money marketing the products and/or services and Impulse would not have compensated its affiliates for the marketing services performed by it in connection with the Contract. (Am. Compl. ¶ 103.) Under these circumstances, it would be fundamentally unfair to permit DCM to deny the existence of a contract and liability thereunder, and DCM should be estopped from doing so.

## **CONCLUSION**

WHEREFORE, Impulse respectfully requests that the Court: (1) deny DCM's Motion in its entirety; or (2) alternatively, in the event the Court grants the Motion, dismiss the Amended Complaint as against DCM without prejudice, so that Impulse may either cure any pleading defects or refile against DCM in another jurisdiction; and/or (3) grant such other and further relief that the Court considers proper.

Dated: New York, New York
          January 23, 2006

KLEIN, ZELMAN, ROTHERMEL & DICHTER, L.L.P.

By: _____
Sean A. Moynihan (SM-5129)
Peter J. Glantz (PG-1063)
485 Madison Avenue
New York, New York 10022
(212) 935-6020
Attorneys for Plaintiff
Impulse Marketing Group, Inc.